910 P.2d 695

STATE of Hawai'i, Plaintiff–Appellee,

v.

Len Kanoi WALLACE, Defendant–
Appellant.

No. 16175.

Supreme Court of Hawai'i.

Jan. 10, 1996.

Benjamin M. Acob, on the briefs, Wailuku, Maui, for defendant-appellant Len Kanoi Wallace.

Mark R. Simonds, Deputy Prosecuting Attorney, County of Maui, on the briefs, Wailuku, Maui, for plaintiff-appellee State of Hawaiʻi.

MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

The defendant-appellant Len Kanoi Wallace appeals the judgment, guilty conviction, and sentence of the Second Circuit Court, following a bench trial in which he was convicted of promoting a dangerous drug in the first degree in violation of Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i) (1993) (Count One)[1], prohibited acts related to drug paraphernalia in violation of HRS § 329–43.5(a) (1993) (Count Two)[2], and promoting a detrimental drug in the second degree in violation of HRS § 712–1248(1)(c) (1993) (Count Three).[3]

Wallace's appeal raises two significant issues, the first involving the interrelationships among searches and seizures pursuant to a lawfully issued warrant, the "plain view" doctrine, and the law of "closed" but transparent "containers," and the second addressing the foundational prerequisites to the admissibility of testimony pertaining to scientifically obtained test measurements within the context of ascertaining the sufficiency of the evidence to convict. Specifically, Wallace contends that: (1) the circuit court erred in denying his motion to suppress evidence of cocaine found in his automobile under circumstances in which (a) "a police officer seized tightly sealed *clear* packets[, containing a] substance ... suspect[ed] to be cocaine, in his search for marijuana, marijuana paraphernalia, and identification items pursuant to a search warrant" (emphasis added), and, (b) "knowing [that] the packets['] contents were not marijuana, law enforcement officers subsequently open[ed] the ... packets for the purpose of testing [their] contents without the authority of a search warrant"; and (2) the "competent evidence" introduced at trial regarding the weights of the seized contraband was insufficient to support his convictions of (a) promoting a dangerous drug in the first degree and (b) promoting a detrimental drug in the second degree.

Although we disagree with contentions 1 and 2(b), we agree with contention 2(a). Accordingly, we affirm Wallace's conviction as to Counts Two and Three.[4] However, for the reasons discussed below, we vacate Wallace's conviction as to Count One and remand the matter to the circuit court for the entry of a judgment of conviction of the lesser included offense of promoting a dangerous drug in the third degree.

1. HRS § 712–1241 provides in relevant part:

> **Promoting a dangerous drug in the first degree.** (1) A person commits the offense of promoting a dangerous drug in the first degree if he knowingly:
> (a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
> (i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]
> ....
> (2) Promoting a dangerous drug in the first degree is a class A felony.

2. HRS § 329–43.5 provides in relevant part:

> **Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony[.]

HRS § 329–1 (1993) defines a "controlled substance" to mean "a drug, substance, or immediate precursor in Schedules I through V of [HRS chapter 329,] part II." Schedules I through V are set out in HRS §§ 329–14 (1993), 329–16 (1993), 329–18 (1993), 329–20 (1993), and 329–22 (1993), respectively.

3. HRS § 712–1248 provides in relevant part:

> **Promoting a detrimental drug in the second degree.** (1) A person commits the offense of promoting a detrimental drug in the second degree if the person knowingly:
> ....
> (c) Possesses one or more preparations, compounds, mixtures, or substances, of an aggregate weight of one ounce or more, containing any marijuana[.]
> ....
> (2) Promoting a detrimental drug in the second degree is a misdemeanor.

"Marijuana" is defined in HRS § 712–1240 (1993) and is distinguished from "marijuana concentrate," which includes hashish and tetrahydrocannabinol.

4. In this appeal, Wallace does not challenge his conviction of prohibited acts related to drug paraphernalia (Count Two).

## I. BACKGROUND

The facts material to the present appeal—as reflected in the evidence adduced in the course of Wallace's bench trial—are not in dispute. On April 19, 1991, at approximately 5:30 p.m., three police officers of the Maui Police Department's Vice/Narcotics Division executed a warrant, issued by a district court judge, authorizing them to search Wallace's automobile for: (1) "an unascertainable amount of marijuana plants"; (2) "paraphernalia associated with the use/distribution of marijuana including, but not limited to, marijuana smoking pipes and devices, marijuana cigarette butt clips, cigarette rolling devices, cigarette papers, heat sealed plastic packets, zip-lock type plastic baggies, and books and publications concerning the use/distribution of marijuana"; and (3) "articles of identification"—such as driver's licenses, identification cards, photographs, handwriting samples, credit cards, checkbooks, and checks—that would establish control over the automobile.

The officers discovered the automobile parked on Ukali Street in Wailuku, Maui. Wallace, the sole occupant of the vehicle, was sitting in the driver's seat. The officers approached, served Wallace with the search warrant, informed him of his constitutional rights, and directed him to exit and stand by the vehicle.

Officer Danny Matsuura conducted the actual search of the automobile. He discovered and seized: (1) a heat-sealed clear plastic packet containing suspected marijuana that was lying on the floor fronting the driver's seat; (2) thirteen ziploc-type clear plastic baggies recovered from the glove compartment; (3) two partially ·burnt marijuana "roaches" recovered from the ash tray; (4) a pack of "Zigzag" cigarette rolling papers found on the console; (5) a brown paper bag containing two ziploc-type baggies of suspected marijuana located on the rear passenger seat; (6) a Hawai'i driver's license and "instruction permit"—both in Wallace's name—removed from the motor vehicle registration holder attached to the sun visor on the driver's side; and (7) a multicolored cloth bag or pouch—inside of which were (a) forty-three heat-sealed clear plastic packets containing a white crystalline powder suspected to be cocaine and (b) a single heat-sealed clear plastic packet containing suspected marijuana—recovered from the driver's seat. An additional marijuana roach and a "paper crutch" made out of a matchbook were discovered and seized from the front pouch of the sweatshirt that Wallace was wearing.

Wallace was placed under arrest and transported to the Wailuku police station. Officer Matsuura drove Wallace's automobile to the police station parking lot to continue the search authorized by the warrant.

During the evening of April 19, 1991, Officer Matsuura opened each of the forty-three packets of suspected cocaine. In accordance with his training, pursuant to which he received certification, he performed a "Becton Dickinson Scott reagent field test" on the substances contained therein in order "to make sure that . . . the substance was what [he] thought it was before [he] . . . actually charge[d]" Wallace with a particular criminal offense. The test results indicated that "each of the samples of each [of the forty-three] packet[s] that [he] tested contained the drug cocaine." Officer Matsuura then weighed the forty-three packets, *i.e.,* the clear plastic containers together with their contents, with a State of Hawai'i certified gram scale and obtained a gross weight of 56.2 grams.[5]

The forty-three packets of cocaine were later forwarded to Donald Chinn, a forensic chemist employed by the Naval Investigative Services Laboratory (NISL), to whose expert qualifications the parties stipulated at trial. Chinn conducted a series of tests, which confirmed the presence of cocaine in each of the packets. In addition, Chinn weighed the contents of the packets with a "top load electronic balance" and obtained a net weight of 40.94 grams—the equivalent of 1.444 ounces.

Also during the evening of April 19, 1991, Officer Matsuura performed a "Becton Dick-

---

5. There being 28.349 grams to the ounce, the gross weight of the forty-three packets therefore converted to 1.982 ounces.

inson Duquenois Levine reagent test" on—and a microscopic examination of—"all of the recovered suspected marijuana" in order to "make sure that it was in fact marijuana so [that he] could charge" Wallace with the proper offense. The tests confirmed that the seized substances contained marijuana. Utilizing a State of Hawai'i certified gram scale, Officer Matsuura obtained a gross weight of 55.4 grams—the equivalent of 1.954 ounces. Officer Matsuura did not undertake to obtain a net weight because the gross weight substantially exceeded the one-ounce threshold establishing the "aggregate weight" element of the offense of promoting a detrimental drug in the second degree, *see supra* note 3, and he did not wish to "disturb the other evidence"—*i.e.,* the two heat-sealed clear plastic packets and the two ziploc-type baggies that had contained the marijuana at the time of their seizure from Wallace's vehicle—which was relevant to the offense of prohibited acts related to drug paraphernalia. *See supra* note 2.

On November 12, 1991, a Maui grand jury returned a three-count indictment charging Wallace with the above-mentioned offenses. On January 27, 1992, Wallace moved to suppress the cocaine on the grounds that, in opening the forty-three heat-sealed clear plastic packets that contained it, Officer Matsuura "either exceeded the scope of the warrant for marijuana or performed a warrantless search of the packets of white powder without justification[.]"

The circuit court conducted a hearing on Wallace's motion on February 13, 1992. Officer Matsuura, the only witness, testified generally to the facts described above. In addition, Officer Matsuura testified that, although the search warrant had authorized the seizure of marijuana, marijuana paraphernalia, and "identification items," he had seized the forty-three heat-sealed clear plastic packets because, based on his training and experience, they contained suspected cocaine. He acknowledged on cross-examination that, as of the time of the initial seizures, it was possible that the white powder was an uncontrolled substance, such as baking powder or

inositol.[6] He also conceded that it had been apparent to him at the time that the white powder was not marijuana.

Following Officer Matsuura's testimony, Wallace argued that, although he was not contesting Officer Matsuura's authority to seize the multicolored cloth bag from his vehicle and to search it for marijuana, he had nevertheless had a reasonable expectation of privacy with respect to the contents of the forty-three packets—which did not contain marijuana—discovered therein and that, by opening the packets and testing their contents, the state agents had violated his constitutional right to be free from unreasonable searches. Accordingly, Wallace urged that all evidence relating to the packets' contents should be suppressed as fruit of the poisonous tree. The circuit court, however, was not of like mind and orally denied Wallace's motion.

On February 25, 1992, the circuit court entered written findings of fact (FOF), conclusions of law (COL), and an order denying Wallace's motion to suppress, including the following:

### FINDINGS OF FACT

. . . .

2. [The search warrant] authorized a search of [Wallace's] vehicle for marijuana, paraphernalia associated with the use and distribution of marijuana, and identification [items relating to Wallace].

. . . .

6. When executing [the search warrant], Officer Matsuura first noticed a heat sealed plastic packet on the floor fronting the driver's seat. Said packet contained what appeared to be marijuana and was seized.

7. A brown paper bag which was located in the back seat area and contained two (2) plastic baggies of suspected marijuana was also seized.

8. A multi colored cloth bag which was located on the front seat of the car was searched. The cloth bag contained one heat sealed packed [sic] of suspected mari-

---

**6.** Inositol is "a sugarlike crystalline substance" that is "present in the leaves and seeds of most

plants." *Taber's Cyclopedic Medical Dictionary* 919–20 (16th ed. 1989).

juana and forty-three (43) heat sealed plastic packets of suspected cocaine, all of which were seized.

9. Officer Matsuura had seen cocaine on hundreds of occasions prior to April 19, 1991.

10. Other items including empty zip lock baggies, suspected marijuana roaches, cigarette rolling papers, a State of [Hawai'i] driver's license and State of [Hawai'i] driver's permit in [Wallace's] name ... were also seized from the car.

11. [Wallace's vehicle] and the keys were also seized.

12. Following seizure of the above mentioned items, Officer Danny Matsuura weighed the forty-three (43) packets of suspected cocaine and obtained a gross weight of 56.2 grams.

13. Officer Matsuura opened each of the forty-three (43) packets of suspected cocaine, is qualified to perform and did perform the Becton Dickinson Scott Reagent field test on each packet, and received a positive chemical color reaction indicating the presence of cocaine.

14. Officer Matsuura did not obtain another search warrant to open and test the forty-three (43) packets of suspected cocaine as *the heat sealed plastic packets were transparent, and the suspected cocaine was in plain view.*

15. [Wallace] was arrested for Promoting a Dangerous Drug in the First Degree, Prohibited Acts Related to Drug Paraphernalia, and Promoting a Detrimental Drug in the Second Degree.

. . . .

## CONCLUSIONS OF LAW

1. A search warrant describing "marijuana" as the thing to be seized gives the officers executing it authority to search, in a reasonable manner, whatever spots within the described premises their professional experience indicates may be used as a cache, and the seizure of *any* evidence of crime in the course thereof is permissible. [ (Emphasis in original.) ] *State v. Davenport,* 55 Haw. 90, 516 P.2d 65 (1973).

2. Officers need not close their eyes when a search reveals illegal drugs other than those authorized in the search warrant. *Id.* at 100, 516 P.2d 65.

3. An otherwise permissible search is not rendered unlawful merely because in the course thereof one drug is discovered instead of a different drug, since there is little chance in such circumstances that a search for the latter is being used as a pretext to search for the former. *Id.* at 100, 516 P.2d 65.

In the instant case, the police had a search warrant for [Wallace's vehicle]. The police located the car. [Wallace] was in the car. The police searched the car and fist [sic] sighted marijuana on the floorboards. Such a finding confirmed the officer's suspicion that [Wallace] was dealing drugs from his car. *The police had the authority to open the cloth bag which was found on the front seat of the car.* Forty-three (43) packets of suspected cocaine and marijuana were found in the cloth bag. The suspected cocaine being in close proximity to the suspected marijuana heightened the officer's suspicion that the white powder was cocaine.

4. "If the original intrusion is justified, such as by consent, hot pursuit, warrant or as incident to an arrest, *objects sighted in plain view will be admissible so long as the view was inadvertent.*" *State v. Stachler,* 55 [58] Haw. 412, 570 P.2d 1323 (1977).

*The forty-three (43) packets* of suspected cocaine *were* in *transparent* heat sealed packets in the cloth bag. *The white powder* suspected of being cocaine *was in plain view* within the cloth bag, and the view was inadvertent. Officer Matsuura had probable cause and reasonable suspicion that the forty-three (43) packets of white powder [were] not sugar when he seized and tested it.

5. A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *United States v. Jacobsen,* 466 U.S. 109 [104 S.Ct. 1652, 80 L.Ed.2d 85] ... (1984). It is well settled that it is constitutionally reasonable for law enforcement officials to seize "ef-

fects" that cannot support a justifiable expectation of privacy without a warrant based on probable cause to believe they contain contraband. *Jacobsen, supra.*

*In the instant case, [Wallace] had absolutely no reasonable expectation of privacy in forty-three (43) packets of cocaine. The police had a right to be where they were, they had a right to search the bag, they had a right to seize, and they had a right to find out what the suspected substance was.*

IT IS HEREBY ORDERED that [Wallace's] Motion to Suppress Evidence is denied.

(Emphases added.) [7]

Wallace's bench trial took place on March 3, 1992. At the close of the evidence and following argument by defense counsel,[8] the circuit court found Wallace guilty of the three charged offenses. Wallace was sentenced on May 6, 1992, and he thereafter timely appealed.

On appeal, as indicated above, Wallace argues that the circuit court erred in denying his pretrial motion to suppress the evidence of the seized cocaine. With respect to the trial, he challenges, as he did after the prosecution rested its case, only the sufficiency of the evidence "to prove that [he] was guilty beyond a reasonable doubt [of] the charges of Promoting a Detrimental Drug in the Second Degree and Promoting a Dangerous Drug in the First Degree," based upon his claims that the prosecution "did not present competent evidence that the marijuana weighed 'one ounce or more' and that the white powder also weighed 'one ounce or more' as required by the corresponding statutes." [9]

## II. *STANDARDS OF REVIEW*

### A. *Conclusions Of Law*

■ A COL is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned.

*State v. Schroeder,* 76 Hawai'i 517, 523, 880 P.2d 192, 198 (1994) (citations, internal quotation marks, and brackets omitted); *see also State v. Pattioay,* 78 Hawai'i 455, 459, 896 P.2d 911, 915 (1995); *State v. Meyer,* 78 Hawai'i 308, 311, 893 P.2d 159, 162 (1995); *State v. Furutani,* 76 Hawai'i 172, 180, 873 P.2d 51, 59 (1994).

### B. *Expectations Of Privacy In The Context Of Searches And Seizures*

■ "The determination of whether a search was lawfully conducted is entirely a question of law, which this court reviews *de novo* under the right/wrong standard." *In re Jane Doe, Born on May 5, 1977,* 77 Hawai'i 435, 438, 887 P.2d 645, 648 (1994) (citation omitted). Thus,

[w]hether an actual, subjective expectation of privacy is one that society would recognize as objectively reasonable is a question of law, and the issue is therefore reviewed *de novo* on appeal. Although this court has not expressly labeled the pertinent standard of review in the past, we have effectively applied the "right/wrong" test.

*State v. Bonnell,* 75 Haw. 124, 142, 856 P.2d 1265, 1275 (1993) (citations omitted).

### C. *Sufficiency Of The Evidence*

■ This court has repeatedly stated that the

evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was tried before a judge or a jury. The test on appeal is not whether guilt is

---

7. It is significant that, on appeal, Wallace does not challenge any of the circuit court's FOF and, with respect to the circuit court's COL, challenges only the highlighted portion of COL No. 5.

8. The prosecution made no argument after the close of the evidence at Wallace's trial.

9. The testimony elicited at trial regarding the weights of the cocaine and marijuana seized from Wallace's vehicle, as well as defense counsel's argument in connection therewith, are discussed *infra* in section III.B. of this opinion.

established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. "Substantial evidence" *as to every material element of the offense charged* is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*State v. Okumura,* 78 Hawai'i 383, 403, 894 P.2d 80, 100, (1995) (quoting *State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995)) (emphasis added).

*State v. Malufau,* 80 Hawai'i 126, 132, 906 P.2d 612, 618 (1995) [hereinafter *Malufau I* ], *reconsideration granted on other grounds,* 80 Hawai'i 134, 906 P.2d 620 (1995); *see also State v. Reed,* 77 Hawai'i 72, 81–82, 881 P.2d 1218, 1227–28 (1994); *In re John Doe, Born on January 5, 1976,* 76 Hawai'i 85, 92–93, 869 P.2d 1304, 1311–12 (1994); *State v. Batson,* 73 Haw. 236, 248–49, 831 P.2d 924, 931, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992).

## III. *DISCUSSION*

A. *Inasmuch As Wallace Had No Reasonable Expectation Of Privacy In The Contents Of The Forty–Three Heat–Sealed Clear Plastic Packets When Officer Matsuura Exposed Them To Plain View By Lawfully Opening The Multicolored Cloth Bag And Seizing The Packets Located Therein, There Was No Search In The Constitutional Sense When The Packets Were Opened And The Contents Later Tested For The Presence Of Cocaine.*

Wallace's first point of error on appeal is that, once seized pursuant to the search war-

rant, the warrantless "further search" of the forty-three heat-sealed clear plastic packets—by way of opening them and testing their contents for the presence of cocaine—contravened the fourth amendment to the United States Constitution [10] and/or article I, section 7 of the Hawai'i Constitution [11], thereby necessitating the reversal of his conviction of promoting a dangerous drug in the first degree. For the reasons discussed below, we disagree.

### 1. *Reasonable expectations of privacy—general principles*

"Like the fourth amendment to the United States Constitution, article I, section 7 of the [Hawai'i] State Constitution protects people from unreasonable government intrusions into their legitimate expectations of privacy." *Bonnell,* 75 Haw. at 136, 856 P.2d at 1272 (citations omitted); *see also Meyer,* 78 Hawai'i at 311–12, 893 P.2d at 162–63. "The basic purpose . . . of these constitutional provisions is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Bonnell,* 75 Haw. at 136, 856 P.2d at 1272 (quoting *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967)) (internal quotation marks and brackets omitted); *see also State v. Lopez,* 78 Hawai'i 433, 441, 896 P.2d 889, 897 (1995).

This Court has adopted the following two-part test, borrowed from the concurring opinion of Justice Harlan in *Katz [v. United States* ], 389 U.S. [347,] 361 [88 S.Ct. 507, 516–17, 19 L.Ed.2d 576] . . .

---

**10.** The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

**11.** Article I, section 7 of the Hawai'i Constitution provides:

The right of the people to be secure in their persons, houses, papers and effects against un-

reasonable searches, seizures *and invasions of privacy* shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

Haw. Const. art. I, § 7 (1978) (emphasis added). The words "invasions of privacy" were added to article I, section 7 (which was denominated article I, section 5 at the time) by the 1968 Constitutional Convention. *State v. Roy,* 54 Haw. 513, 518, 510 P.2d 1066, 1069 (1973) (Levinson, J., concurring).

[ (1967) ], to determine when a person's expectation of privacy may be deemed reasonable: "First, one must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable."

*Bonnell,* 75 Haw. at 139, 856 P.2d at 1273–74 (quoting *State v. Biggar,* 68 Haw. 404, 407, 716 P.2d 493, 495 (1986)) (other citations omitted); *see also Lopez,* 78 Hawai'i at 441–42, 896 P.2d at 897–98.

▮▮▮ The privacy provision contained in article I, section 7 of the Hawai'i Constitution is now "limit[ed in] its application to criminal cases[.]" Stand.Comm.Rep. No. 69, *reprinted in* 1 Proceedings of the Constitutional Convention of Hawai'i of 1978 [hereinafter, "1 Proceedings"] at 674 (1980). "Privacy," within the meaning of the *Katz* test and as subsumed within article I, section 7, "is not a fundamental right but [rather] a test of whether the prohibition against unreasonable searches and seizures applies." Comm. Whole Rep. No. 15, *reprinted in* 1 Proceedings at 1024.[12] Assuming an unreasonable search or seizure, any evidence derived therefrom "is inadmissible in a criminal prosecution, and ... a conviction obtained thereby must be reversed." *State v. Davenport,* 55 Haw. 90, 92, 516 P.2d 65, 67–68 (1973) (citing *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and *State v. Pokini,* 45 Haw. 295, 367 P.2d 499 (1961)); *see also Bonnell,* 75 Haw. at 138, 856 P.2d at 1273; *State v. Texeira,* 62 Haw. 44, 51, 609 P.2d 131, 136 (1980).

▮▮▮ "We have stated that if anything is settled in the law of search and seizure, it is that a search without a warrant issued upon probable cause is unreasonable per se." *Meyer,* 78 Hawai'i at 312, 893 P.2d at 163 (quoting *State v. Fields,* 67 Haw. 268, 281, 686 P.2d 1379, 1389 (1984)) (internal quotation marks, brackets, some punctuation, and additional citations omitted). That being the case, any warrantless search of a constitutionally protected area is presumptively unreasonable unless there is both probable cause and a legally recognized exception to the warrant requirement. *Bonnell,* 75 Haw. at 137, 856 P.2d at 1273; *see also State v. Propios,* 76 Hawai'i 474, 477, 879 P.2d 1057, 1060 (1994); *State v. Perham,* 72 Haw. 290, 292, 814 P.2d 914, 915, *reconsideration denied,* 72 Haw. 616, 841 P.2d 1074 (1991); *State v. Wiley,* 69 Haw. 589, 591, 752 P.2d 102, 103 (1988); *State v. Ritte,* 68 Haw. 253, 256–57, 710 P.2d 1197, 1201 (1985); *State v. Barrett,* 67 Haw. 650, 653–54, 701 P.2d 1277, 1280 (1985); *Fields,* 67 Haw. at 281, 686 P.2d at 1384; *State v. Ortiz,* 67 Haw. 181, 184, 683 P.2d 822, 825 (1984); *State v. Russo,* 67 Haw. 126, 137, 681 P.2d 553, 561 (1984); *State v. Clark,* 65 Haw. 488, 493, 654 P.2d 355, 359–60 (1982); *State v. Kaluna,* 55 Haw. 361, 363, 520 P.2d 51, 55 (1974). "In general, these exceptions provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." *Clark,* 65 Haw. at 494, 654 P.2d at 360 (citations and internal quotation marks omitted); *see also Meyer,* 78 Hawai'i at 312, 893 P.2d at 163.

▮▮▮ However, "[w]hen a governmental intrusion does not invade an individual's legitimate expectation of privacy, there is no

---

**12.** By contrast, as a result of the 1978 Hawai'i Constitutional Convention and the election of November 7, 1978, a new provision—article I, section 6—was added to the Hawai'i Constitution. Article I, section 6, entitled "Right to privacy," provides in relevant part that "[t]he right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest" and "relates to privacy in the informational and personal autonomy sense." Stand.Comm.Rep. No. 69, *reprinted in* 1 Proceedings at 674. In promulgating article I, section 6, the Convention intended "that privacy [be] treated as a fundamental right for purposes of constitutional analysis." Comm.Whole Rep. No. 15,

*reprinted in* 1 Proceedings at 1024. The newly and expressly codified right of privacy included: (1) "the right of an individual to tell the world to 'mind your own business' "; (2) "the right to be left alone"; and (3) "[t]he right to personal autonomy, to dictate [one's] lifestyle, [and] to be oneself." Stand.Comm.Rep. No. 69, *reprinted in* 1 Proceedings at 674.

Although Wallace invokes both article I, sections 6 and 7 with respect to his alleged reasonable expectation of privacy in the contents of the forty-three heat-sealed clear packets containing cocaine, only the latter constitutional provision is pertinent to the search and seizure issue raised in this appeal.

'search' subject to the Warrant Clause." *Meyer*, 78 Hawai'i at 312, 893 P.2d at 163 (quoting *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983)) (some internal quotation marks omitted). Put differently, absent a governmental invasion of a person's legitimate expectations of privacy, there is no " 'search' in the constitutional sense." *Lopez*, 78 Hawai'i at 441, 896 P.2d at 897 (citations omitted). As a general matter, "[a] 'search' implies that there is an exploration for an item or that the item is hidden." *Meyer*, 78 Hawai'i at 312, 893 P.2d at 163 (citation omitted).

2. *Searches pursuant to a warrant, "plain view," opaque "closed" containers, transparent containers, and the expectation of privacy in the identity of a substance*

In *Davenport, supra*, this court engaged in a detailed analysis—which we expressly reaffirm today—of the permissible scope of a search pursuant to a warrant authorizing the executing officers to search for marijuana at a particular location; that analysis, being particularly germane to the present appeal, bears repetition:

> [P]olice officers, armed with the warrant to search for marijuana, arrived at the house in which the defendant resided.... Thereafter, in the course of a particularized search of each of the bedrooms, officers ... discovered in the defendant's bedroom, on a table top less than four feet from the mattress on which the defendant had been sleeping, a clear cellophane bag containing a grass-like substance resembling marijuana, a wooden matchbox, and a wallet. *The officers proceeded to open the matchbox, in which they found* eighty-six white tablets and *a bag containing a white powder substance,* and the wallet, in which they found identification cards belonging to the defendant. *Upon later laboratory analysis,* the grass-like substance was found to be marijuana, the pills were found to be amphetamines, and *the powder was found to be cocaine.* These drugs, and the identification found in the wallet, were introduced as evidence in the defendant's trial.

> ... *[We cannot] agree with the defendant that the police exceeded the proper scope of the warrant when they searched the matchbox* and wallet in the defendant's room. These items were side by side with the bag containing what appeared to be marijuana, and rested in open view [13] on the top of a table. [The] [o]fficers ..., both veteran narcotics investigators, testified that in their experience marijuana was often secreted in just such receptacles. In view of the easy mobility of such contraband, a warrant specifying the particular premises within which it is hidden is sufficiently detailed to satisfy the constitutional requirement that a warrant particularly describe the place to be searched. Moreover, *such a warrant gives the officers executing it authority to search, in a reasonable manner, whatever spots within the described premises their professional experience indicates may be used as a cache.*

> Certainly a matchbox and a wallet, which are *plausible repositories for marijuana* and *which are exposed* on the top of a table, *are not beyond the scrutiny of police officers executing a warrant which describes "marijuana" as the thing to be seized. Nor need the officers close their eyes when a search of such containers reveals illegal drugs other than marijuana. An otherwise permissible search is not rendered unlawful merely because in the course thereof one drug is discovered instead of a different drug, since there is little chance in such circumstances that a search for the latter is being used as a pretext to search for the former.* So long as the searching officer is in a position where he is lawfully entitled to be, the seizure of *any* evidence of crime is permissible.

> We therefore hold that the warrant in this case was lawfully executed by the police and the evidence used against the defendant at trial properly seized.

*Davenport*, 55 Haw. at 98–101, 516 P.2d at 71–72 (citations omitted) (some emphasis in

---

**13.** Actually, the items rested in "plain"—rather than "open"—view. *See infra* section III.A.2.a.

original and some added) (some internal quotation marks and parentheses omitted).

Wallace concedes in his opening brief, as he must, that *Davenport* "may seem to be directly on point and against [his] position." Wallace suggests, however, that "the [a]ppellant in *Davenport* apparently did not raise the issue of whether the opening of the packets without a warrant for the purpose of testing the contents of the packets was an illegal warrantless search" and seeks to distinguish *Davenport* in the following manner:

> [Wallace] does not contest the opening of the multi-colored bag in which the packets of white powder were found. That issue has been decided in *Davenport.* The multi-colored bag was apparently opened for the search [for] marijuana, marijuana paraphernalia, and identification items. And as long as the requirements of the plain-view doctrine are met, the seizure of the packets [was] proper. But the doctrine, if applicable, allows just the seizure alone [citing *United States v. Coolidge [Coolidge v. New Hampshire]*, 403 U.S. 443, 466 [91 S.Ct. 2022, 2038, 29 L.Ed.2d 564] (1971), and *Davenport*, 55 Haw. at 101, 516 P.2d at 72]. ... [T]he Hawai'i Supreme Court ... has adopted the plain-view doctrine.
>
> [Wallace] challenges the opening and thereby [the] testing [of] the contents of the packets. [Wallace] contends that seizure of an item does not necessarily authorize further search without a warrant. *State v. Kaluna, supra,* exemplifies the principle that "a search should be no broader than necessary." *See also State v. Ching,* 67 Haw. 107, 678 P.2d 1088 (1984) (in inventorying lost property, the State's paramount goal is to identify the owner and therefore the police may search lost property to the extent necessary for identification purposes), and *State v. Hook,* [60 Haw. 197, 587 P.2d 1224 (1978)].
>
> . . . .
>
> ... [I]n the present case, the search warrant only authorized the search for marijuana, items of identification, and marijuana paraphernalia. In his search for marijuana, Officer Matsuura found packets of white powder[,] which packets were constitutionally protected as they were tightly sealed, unlabeled, and with the contents not readily identifiable. Officer Matsuura testified that he knew that the contents of the packets were not marijuana[,] but he suspected it to be cocaine.... The only way he knew that it was indeed cocaine was after he opened the packets and tested the contents. *See State v. Barnes,* [58] Haw. 333, 568 P.2d 1207 (1977). (The arresting officer could not have known of the marijuana in the brown paper bag without first seizing it and examining its contents.)
>
> Although seizure of the packets may come under the plain-view doctrine, [the] search [comprised] of opening them and testing [their] contents was unreasonable. Officer Matsuura suspected that the packets contained cocaine, but probable cause has to be found by a district judge in the form of a search warrant[,] and[,] until that was found, he could not open the packets. *State v. Hook, supra.* The packets were already seized and Officer Matsuura had all the time to obtain a warrant and did not have to be concern [sic] about exigent circumstances or other reasons why the packets had to be opened without a warrant. *See State v. Goodwin,* 7 Haw.App. 261, [264, 752 P.2d 598, 601] (1988) (The fact that a police officer has probable cause to believe that an arrestee's backpack[,] which is in the police officer's exclusive control, contains contraband does not authorize the police officer to conduct a warrantless search of the backpack for contraband.)
>
> The plain view doctrine dictates that: if the original intrusion is justified, such as by consent, hot pursuit, warrant or as incident to an arrest, *objects sighted in plain view* will be admissible so long as the view was inadvertent. (Emphasis added.)
>
> *State v. Stachler,* 58 Haw. 412, [417,] 570 P.2d 1323[, 1327] (1977).
>
> Following the [plain view] doctrine, the unopened packets of white powder in and of themselves would be admissible if they were evidence of anything. But at trial, they were not introduced as evidence of unopened packets of white powder. They

were opened [and] introduced into evidence [as material] tested to be cocaine. *Had the search warrant authorized the search of cocaine also, it would have been perfectly legal for the officers to open and test the contents of the packets.* This is dissimilar to a case of a readily identifiable item seized pursuant to the plain-view doctrine where the item would be admitted into evidence without having been subjected to further search and/or seizure. Such readily identifiable items would include firearms, deadly weapons, a stolen car identified by its license plate[,] or a readily identifiable plant [such] as marijuana.

. . . .

[In COL No. 5], [t]he trial court erred in concluding that "[Wallace] had absolutely no reasonable expectation of privacy in forty-three (43) packets of [alleged] cocaine" and [that] "they [police] had a right to find out what the suspected substance was" [without the authority of a warrant]. The trial court relied on *United States v. Jacobsen*, 466 U.S. 109 [104 S.Ct. 1652, 80 L.Ed.2d 85] . . . (1984).

The opening and thereby testing of the contents violated . . . the Hawai'i State Constitution. . . . For whatever reasons citizens place these substances in plastic packets, the Hawai'i State Constitution provides that . . . privacy as to the contents of these packets will be protected.

In reliance [on] *Jacobsen* and concluding that the law enforcement officers had a right to know what the substance was, the trial court ignored the "privacy" right afforded by the Hawai'i State Constitution.

Wallace's opening brief at 19–24 (some citations omitted) (some brackets in original and some added) (emphases added).

Wallace's argument is disingenuous insofar as it ignores the plain language of *Davenport*, distorts and misapplies the plain view doctrine, misapprehends not only the law regarding "closed containers" in general, but also the significance of transparent "closed containers" within the context of searches pursuant to a duly issued and properly executed warrant in particular, and overextends the construct of "reasonable expectations of privacy."

### a. *"Plain view" in general*

■ In *Meyer, supra,* we recently had occasion to synthesize the current state of Hawai'i law regarding the interrelationship between the "open view" and "plain view" doctrines, on the one hand, and the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution, on the other. Our discussion was prompted by the prosecution's appeal from an order of the circuit court granting the defendant's (Meyer's) motion to suppress evidence of a handgun that had been lying on the floor of his truck when a police officer had approached the truck to secure it after Meyer had been arrested for abuse of a family or household member. Holding that, because the handgun had been observed in plain view, the presence of exigent circumstances was not required in order to justify the *warrantless* seizure of the handgun, we reversed the circuit court's order, reasoning as follows:

A search implies that there is an exploration for an item or that the item is hidden. *State v. Hanawahine*, 50 Haw. 461, 465, 443 P.2d 149, 152 (1968). However, neither factor is present in open view or plain view observations, and *neither* observation *involves a search in the constitutional sense*. In other words, *neither open view nor plain view observations involve an invasion of an individual's reasonable expectation of privacy. [State v.] Kapoi,* 64 Haw. [130,] 140, 637 P.2d [1105,] 1113 [ (1981) ]; *Horton v. California,* 496 U.S. 128, 133 [110 S.Ct. 2301, 2305–06, 110 L.Ed.2d 112] . . . (1990) (when object is in plain view, its observation does not violate any privacy interests); *State v. Kaaheena,* 59 Haw. 23, 28, 575 P.2d 462, 466 (1978) (in open view sighting, governmental observation of the item does not constitute a search in the constitutional sense).

This court, in *Kaaheena,* distinguished the two doctrines:

The open view doctrine is distinguishable from the visually similar, but legally distinct, plain view doctrine. In the plain view situation[,] the view takes place *after* an intrusion into activities or

areas as to which there is a reasonable expectation of privacy. The officer has already intruded, and, if his [or her] intrusion is justified, the objects in plain view, sighted inadvertently, will be admissible.

In the open view situation, however, the observation takes place from a non-intrusive vantage point. The governmental agent is either on the outside looking outside or on the outside looking inside [at] that which is knowingly exposed to the public. The object under observation is not within the scope of the constitution.

*Id.* at 28–29, 575 P.2d at 466–67 (internal quotation marks, internal citations, and footnote omitted) (emphasis in original).

. . . .

In legitimate open view sightings, the *warrantless* seizure of the evidence in question depends on whether the item is in a constitutionally protected area. If the evidence is not in an area where there is a reasonable expectation of privacy, that is, if it is located in a common space, such evidence is subject to seizure by the governmental agent who spots it, without the necessity of a warrant or exigent circumstances. "If a police [officer] sees probable evidence in open view in a constitutionally nonprotected area, he [or she] may, of course, seize it[.] He [or she] seizes it because there is no constitutional provision to gainsay the seizure." *State v. Hook,* 60 Haw. 197, 201, 587 P.2d 1224, 1228 (1978) (citation omitted).

However, if the evidence in question is in open view in an area in which the evidence retains its constitutional protection, a warrant is required or exigent circumstances must exist before the object may be seized. "Visibility of contraband within constitutionally protected premises in not enough to justify entry and seizure without a warrant." *Id.* at 202, 587 P.2d at 1228. In attempting to define "exigent circumstances," this court in *Clark* stated:

[although] the term "exigent circumstances" is incapable of precise definition, generally speaking . . . it may be said to exist when the demands of the occasion reasonably call for an immediate police response. More specifically, it includes situations presenting an immediate danger to life or of serious injury or an immediate threatened removal or destruction of evidence. However, the burden, of course, is upon the government to prove the justification. . . .

*Clark,* 65 Haw. at 494, 654 P.2d at 360 (internal citations and brackets omitted).

. . . .

The United States Supreme Court, in *Coolidge,* held that three factors are required to merit a legitimate plain view observation: (1) prior justification for the intrusion; (2) inadvertent discovery [14]; and (3) probable cause to believe the item is evidence of a crime or contraband. 403 U.S. at 465–473 [91 S.Ct. at 2037–42, 29 L.Ed.2d 564]. . . . This court has implicitly adopted all three of the *Coolidge* re-

---

14. In *Meyer,* 78 Hawai'i at 314 n. 6, 893 P.2d at 165 n. 6, we noted that, in *Horton,*

the United States Supreme Court eliminated inadvertence as a requirement of a plain view sighting. However, because we continue to believe that the factor of inadvertence is necessary for the protection of our citizens in order to foster the objective of preventing pretextual article I, section 7 activity, we decline to follow *Horton* to the extent it eliminated inadvertence as a requirement of a plain view sighting. As the dissent by Justice Brennan, joined by Justice Marshall, noted,

[t]he rationale behind the inadvertent discovery requirement is simply that we will not excuse officers from the general requirement of a warrant to seize if the officers know the location of evidence, have probable cause to

seize it, intend to seize it, and yet do not bother to obtain a warrant particularly describing that evidence.

*Id.,* 496 U.S. at 144–45 [110 S.Ct. at 2311–12]. . . .

Our departure from *Horton* in *Meyer* was merely another instance of our longstanding recognition, beginning with *State v. Texeira,* 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967), that "as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader protection under the Hawai'i Constitution than that given by the federal constitution." *State v. Hoey,* 77 Hawai'i 17, 36, 881 P.2d 504, 523 (1994) (citation omitted) (declining to follow *Davis v. United States,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)).

quirements in [*State v.*] *Powell* [, 61 Haw. 316, 603 P.2d 143 (1979)].

... Under the plain view doctrine, the requirement of exigent circumstances may be an issue where, because of the *warrantless* intrusion, the police were placed in plain view of the evidence. However, once the intrusion is justified, there is no requirement of exigency to seize evidence in plain view.

... This interpretation has been upheld ... by the Supreme Court ...:

The context in which the [*Coolidge*] plurality used the phrase, ["plain view *alone* is never enough to justify the warrantless seizure of evidence,"] however, indicates that it was merely a rephrasing of its conclusion ... that in order for the plain-view doctrine to apply, a police officer *must be engaged in a lawful intrusion or must otherwise legitimately occupy the position affording him a "plain view."*

*Texas v. Brown,* 460 U.S. 730, 737 n. 3 [103 S.Ct. 1535, 1541 n. 3, 75 L.Ed.2d 502] ... (1983) (emphasis in original).

....

In valid plain view observations, the intrusion has already lawfully occurred, and the seizure of the evidence in question is an extension of the exception to the warrant requirement. Therefore, as stated by the Supreme Court, " *[p]lain view*' is perhaps *better understood,* ... not as an independent 'exception' to the Warrant Clause, but *simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." Brown,* 460 U.S. at 738–39 [103 S.Ct. at 1541–42]....

Based on the foregoing, we hold that, *where a governmental agent is engaged in a lawful intrusion and inadvertently observes evidence of a crime, the seizure of such evidence does not require any further constitutional protection.*

*Meyer,* 78 Hawai'i at 312–14, 316–17, 893 P.2d at 163–65, 167–68 (some citations omitted) (some brackets and ellipsis points in original and some added) (emphases added) (some internal quotation marks omitted); *see also Bonnell,* 75 Haw. at 144–45 & n. 7, 856 P.2d at 1276 & n. 7.

b. *"Plain view" and searches and seizures pursuant to a warrant*

Throughout this case, Wallace has consistently acknowledged that, pursuant to the lawfully issued warrant, Officer Matsuura was entitled to *seize* the multicolored cloth bag, *search* its contents for marijuana, and *seize* the forty-three heat-sealed clear plastic packets of suspected cocaine, inasmuch as the packets, once the bag was reasonably opened (*i.e.,* searched), were in plain view and "reveal[ed] illegal drugs other than marijuana." *See Davenport,* 55 Haw. at 98–101, 516 P.2d at 71–72. Nevertheless, as indicated above, Wallace maintains that Officer Matsuura's "plain view" of the packets allowed "just the seizure alone" and that any "further search"—by way of opening the packets and testing their contents—was "unreasonable" in the absence of the issuance of an additional search warrant based upon probable cause. Wallace's position is untenable for at least two reasons.

▬ First, as we have noted, absent a governmental invasion of a person's legitimate expectations of privacy, there is no "search" in the constitutional sense. *Lopez,* 78 Hawai'i at 441, 896 P.2d at 897. That is precisely why legitimate "plain view observations" do not "involve[ ] a search in the constitutional sense." *Meyer,* 78 Hawai'i at 312, 893 P.2d at 163. In other words, truly "plain view observations" incident to a non-pretextual and otherwise reasonably conducted search pursuant to a lawfully issued warrant particularly describing the place to be searched and the objects or things to be seized, on the one hand, and "searches in the constitutional sense," on the other, are mutually exclusive. This is because a "search in the constitutional sense" necessarily entails "a governmental invasion of a person's legitimate expectations of privacy," *Lopez,* 78 Hawai'i at 441, 896 P.2d at 897, whereas "plain view observations [do not involve] an invasion of an individual's reasonable expectation of privacy." *Meyer,* 78 Hawai'i at 312, 893 P.2d at 163.

Thus, by their very nature, Officer Matsuura's plain view observations *could not* have

invaded any reasonable expectation of privacy on Wallace's part in the forty-three heat-sealed clear plastic packets and their contents. *Id.; Kapoi*, 64 Haw. at 140, 637 P.2d at 1113; *Horton*, 496 U.S. at 133. Armed with the warrant to search Wallace's vehicle for marijuana and related paraphernalia, Officer Matsuura possessed the "authority to *search*, in a reasonable manner, whatever spots within the described premises [his] professional experience indicate[d] [might] be used as a cache." *Davenport*, 55 Haw. at 100, 516 P.2d at 72. (Emphasis added.) Accordingly, Officer Matsuura had *already* justifiably intruded into the multicolored cloth bag when he inadvertently discovered the transparent packets. *Meyer*, 78 Hawai'i at 313, 893 P.2d at 164; *Kaaheena*, 59 Haw. at 28, 575 P.2d at 466. It therefore follows that Officer Matsuura's plain view observations of the transparent packets and their contents were "simply ... an extension of ... the prior justification"—*i.e.*, the warrant to search Wallace's vehicle for marijuana and related paraphernalia—for his "access to [the] object[s]." *Meyer*, 78 Hawai'i at 317, 893 P.2d at 168; *Brown*, 460 U.S. at 739, 103 S.Ct. at 1541. That being the case, the plain view observations did not invade any reasonable expectation of privacy on Wallace's part and, therefore, did not constitute a "further" and conceptually distinct "search" for constitutional purposes. For that reason, the plain view observations provided no basis for the "further constitutional protection" of an additional warrant as a precondition to opening the transparent packets. *Meyer*, 78 Hawai'i at 317, 893 P.2d at 168.

■ Second, and because legitimate plain view observations—which, as we have noted, occur inadvertently after there has been a "justified" governmental intrusion into "activities or areas as to which there is a reasonable expectation of privacy," *see Meyer*, 78 Hawai'i at 312–13, 893 P.2d at 163–64; *Kaaheena*, 59 Haw. at 28, 575 P.2d at 466—are not "searches in the constitutional sense," the plain view doctrine has direct constitutional significance only for purposes of determining the circumstances under which evidence may be *seized*.

It is well established that under certain circumstances the police may *seize* evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence *seized* by the police will be in plain view, at least at the moment of *seizure*. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance, rather than being simply the normal concomitant of any search, legal or illegal.

An example of the applicability of the "plain view" doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the *seizure* is also legitimate.

*Coolidge*, 403 U.S. at 465, 91 S.Ct. at 2037 (internal citations omitted) (some emphasis in original and some added). But, as noted, the legitimation of the seizure of an object or thing in plain view may have clear implications regarding an individual's *future* expectations of privacy with respect to the object or thing seized.

In any event, viewed from this perspective, Officer Matsuura's seizure of the forty-three heat-sealed clear plastic packets was fully supported by the circuit court's unchallenged FOF and COL that: (1) the search warrant authorized the search of Wallace's vehicle for marijuana and related paraphernalia (FOF No. 2); (2) Officer Matsuura was authorized to open the bag because, based on his professional experience, it could be used as a cache for marijuana (COL Nos. 1 and 3); (3) the packets, being transparent plastic, contained suspected cocaine (FOF Nos. 8 and 14); (4) Officer Matsuura's view of the packets' contents was inadvertent (COL No. 4); (5) Officer Matsuura had seen cocaine on "hundreds" of prior occasions (FOF No. 9); (6) Officer Matsuura possessed the expert qualifications to perform chemical testing for the presence of cocaine in a substance (FOF No. 13); (7) the packets of suspected cocaine,

being in "close proximity to the suspected marijuana," heightened Officer Matsuura's suspicion that the white powder within the packets was cocaine (COL No. 3); and (8) Officer Matsuura was not obligated to "close his eyes" when his search revealed an illegal drug other than those authorized in the search warrant (COL No. 2).

Thus, because (1) Officer Matsuura's "intrusion" into the multicolored cloth bag was supported by the "prior justification" of the lawfully issued search warrant, (2) the forty-three heat-sealed clear plastic packets were discovered inadvertently, and (3) Officer Matsuura had probable cause to believe that the transparent packets contained evidence of a crime or contraband (*i.e.*, cocaine), Officer Matsuura engaged in "a legitimate plain view observation" of the packets and their contents. *Meyer*, 78 Hawai'i at 314, 893 P.2d at 165. Accordingly, the seizure of the packets could be lawfully effected without "any further constitutional protection." *Id.* at 317, 893 P.2d at 168. Moreover, and as we will demonstrate below, the fact that the *contents* of the packets, which Officer Matsuura had probable cause to believe consisted of cocaine, were in plain view likewise justified opening the packets because Wallace had lost any reasonable expectation of privacy in them.

### c. *Search, seizure, "closed containers," and transparency*

Wallace makes much of his observation that the transparent packets were "tightly sealed" and "unlabeled." His citation of *Ka-*

*luna, Barnes, Ching,* and *Goodwin* in connection with this observation suggests that he is invoking the law of "closed containers" in support of his contention that Officer Matsuura's opening the packets amounted to an unconstitutional warrantless search.[15] However, assuming *arguendo* that opening the packets was a warrantless "further search", the case law regarding warrantless searches of the contents of *opaque,* and therefore "closed," containers is inapposite to plain view observations of the contents of containers that are *clear* or *transparent.*

#### i. *opaque containers*

■ We begin our analysis with an overview of the applicable law governing the warrantless search and seizure of "closed" containers. As a general proposition, "the Fourth Amendment [to the United States Constitution] provides protection to the owner of every *container that conceals its contents from plain view." United States v. Ross,* 456 U.S. 798, 822–23, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982) (citation omitted) (emphasis added). Accordingly, the rules articulated in section III.A.1. of this opinion apply to the search and seizure of such "closed" containers.

Over the years (both before and after *Ross* ), and as a matter of state constitutional law, the appellate courts of this state have impliedly applied and extended the law of closed containers in interpreting the parameters of article I, section 7 of the Hawai'i Constitution.[16] As it happens, the cases cited

---

15. Wallace's additional citation of *State v. Hook,* 60 Haw. 197, 587 P.2d 1224 (1978), is totally off point. The holding of *Hook* was that, even when an *open* view (in that instance, from a parked automobile on a public street) of contraband, located within constitutionally protected premises (in that instance, a locked shed), conclusively established probable cause to effect a search and seizure, a warrantless entry into the premises is impermissible absent exigent circumstances. *Id.* at 202–04, 587 P.2d at 1228–29. *See Meyer,* 78 Hawai'i at 313, 893 P.2d at 164 ("In legitimate *open* view sightings, the warrantless seizure of the evidence in question depends on whether the item is in a constitutionally protected area.... [I]f the evidence in question is in *open* view in an area in which the evidence retains its constitutional protection, a warrant is required or exi-

gent circumstances must exist before the object may be seized." (Emphases added.)).

16. For example, in *State v. Faulkner,* 64 Haw. 101, 637 P.2d 770 (1981), we stated that

In *State v. Elliott,* 61 Haw. 492, 605 P.2d 930 (1980), this court held that a *warrantless* search of an automobile would be proper where the police had probable cause to search at the time of the *warrantless* search and seizure, and they had reason to believe that because of the car's mobility or exposure, there was a foreseeable risk that it might be moved or that the evidence which it contained might be removed or destroyed before a warrant could be obtained. This is the gist of the so-called "automobile exception" to the warrant requirement. *Id.* To justify a *warrantless* search under this exception, it must be evident

by Wallace provide apt illustrations, all of which share two critical characteristics: (1) legally unjustified *warrantless* governmental intrusions into (2) *opaque,* and therefore "closed," containers in the concealed contents of which the defendants had a reasonable expectation of privacy. *See Kaluna,* 55 Haw. at 363–64, 369–75, 520 P.2d at 55, 58–62 (holding that *warrantless* search of contents

of a folded, *opaque* tissue, in which arrestee retained a reasonable expectation of privacy, removed from arrestee's brassiere following legitimate warrantless seizure incident to a valid custodial arrest and inventorying of arrestee's possessions, was "unreasonable" under precursor to article I, section 7 of Hawai'i constitution because (1) it was broad-

that the police had probable cause to search at the time of the search and seizure, and it must further be shown that *exigent circumstances* were the motivating factor behind the immediate search.

*Id.* at 106–07, 637 P.2d at 775 (citations omitted) (emphases added).

In *State v. Wong,* 68 Haw. 221, 708 P.2d 825 (1985), however, this court, applying search and seizure law under article I, section 7 of the Hawai'i Constitution, affirmed the suppression of the warrantless search of a closed handbag removed from the automobile of a defendant who had been arrested for promoting detrimental drugs and the consequent warrantless seizure of marijuana and cocaine located therein, reasoning as follows:

With respect to the contraband found in the black handbag, we agree with the State that the police may secure the handbag for safekeeping purposes. However, the warrantless search of the handbag was unreasonable. Once the police gained exclusive control over the handbag, they should have obtained a search warrant before searching it.

The State argues that, under *United States v. Ross,* 456 U.S. 798 [102 S.Ct. 2157, 72 L.Ed.2d 572] ... (1982), [the officer] could lawfully search *any container* found within [the defendant's] automobile [hereinafter, the *"Ross* proposition"]. This reliance on *Ross* is misplaced. *Ross* requires the police officer to have probable cause to search the entire vehicle before any search may be conducted of any container found therein. We need not reach the [*Ross* proposition] in this case. There is no evidence that [the officer] had probable cause to search the entire vehicle. In fact, [the officer] himself testified that he did not search the entire vehicle because there was no indication that more contraband was concealed.

*Id.* at 224–25, 708 P.2d at 829 (internal citations omitted) (emphasis added).

Given our thorough development of the principles that "any warrantless search of a constitutionally protected area is presumptively unreasonable unless there is both probable cause and a legally recognized exception to the warrant requirement" and that "[i]n general, these exceptions provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate," *see* section III. A.1. of this opinion and the accompanying cases, we perceive no good reason, as a matter of state

constitutional law, to leave the *Ross* proposition in limbo. Accordingly, "as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution,"— in this case, article I, section 7—and being "free to give broader protection under the Hawai'i Constitution than that given by the federal constitution," *see supra* note 14, we hereby decline to follow *Ross* to the extent that, whenever the police have probable cause to believe that contraband may be found within an automobile, it permits a *warrantless* search not only of the automobile, but also of the contents of any closed container found inside it. As the dissent in *Ross* (with which we agree) by Justice Marshall, joined by Justice Brennan, noted,

[A]lthough the Court purports to rely on the mobility of an automobile and the impracticability of obtaining a warrant, it never explains why these concerns permit the warrantless search of a *container,* which can easily be seized and immobilized while police are obtaining a warrant.

. . . .

... [T]he traditional rationales for the automobile exception plainly do not support extending it to the search of a container found inside a vehicle.

The practical mobility problem—deciding what to do with both the car and the occupants if an immediate search is not conducted—is simply not present in the case of movable containers, which can easily be seized and brought to the magistrate. The lesser-expectation-of-privacy rationale also has little force. A container, as opposed to the car itself, does not reflect diminished privacy interests. Moreover, the practical corollary that this Court has recognized—that depriving occupants of the use of a car may be a greater intrusion than an immediate search—is of doubtful relevance here, since the owner of a container will rarely suffer significant inconvenience by being deprived of its use while a warrant is being obtained.

Ultimately, the majority, unable to rely on the justifications underlying the automobile exception, simply creates a new "probable cause" exception to the warrant requirement for automobiles. We have soundly rejected attempts to create such an exception in the past, and we should do so again today.

*Ross,* 456 U.S. at 828–32, 102 S.Ct. at 2174–77 (Marshall, J., dissenting) (citations omitted) (emphasis in original).

er than necessary in light of initial justification for departure from general warrant requirement and (2) there were less intrusive means of accomplishing basic purposes of initial warrantless intrusion); *Barnes,* 58 Haw. at 338–39, 568 P.2d at 1211–12 (reversing conviction arising out of *warrantless* seizure of *opaque* paper bag and search of its contents (marijuana), where (1) scope of governmental intrusion in connection with temporary investigative stop exceeded that which was minimally necessary for discovery of weapons, (2) investigating officer had no basis for reasonable suspicion that defendant was armed and presently dangerous, (3) there was nothing in nature and appearance of bag to give rise to reasonable belief that it contained a weapon, (4) contents of bag were not in plain view, and (5) officer lacked probable cause to believe that bag contained contraband); *Ching,* 67 Haw. at 110–13, 678 P.2d at 1092–93 (affirming suppression of contents (cocaine) of *opaque* and sealed two inch by one-half inch brass cylinder attached to keychain, in which defendant retained reasonable expectation of privacy, which was subjected to *warrantless* inventory search of lost property, because facts did not support objectively reasonable belief that cylinder contained valuable or dangerous contents, and holding that, under article I, section 7 of Hawaiʻi Constitution, search was broader than absolutely necessary to accomplish its purpose inasmuch as there were less intrusive means to protect police from false claims and to negate any danger presented); *Goodwin,* 7 Haw.App. at 263–65, 752 P.2d at 601–02 (reversing defendant's conviction of carrying a deadly weapon—a blackjack—discovered as result of lawful warrantless seizure of defendant's backpack incident to defendant's lawful arrest, on grounds that (1) backpack was not in defendant's possession at time of *warrantless* search of its contents in which defendant had reasonable expectation of privacy, (2) arresting officer had exclusive control of backpack, and (3) there were reasonable non-dangerous alternatives with respect to its disposition). *See also Ortiz,* 67 Haw. at 188–89, 683 P.2d at 828–29 ("In the [warrantless] search incident to arrest context, ... the police may not search an area or *container* within their exclusive control or outside

the detainee's reach.") (emphasis added); *State v. Joyner,* 66 Haw. 543, 669 P.2d 152 (1983) (holding that defendant retained reasonable expectation of privacy in vinyl athletic bag, and warrantless search of contents of two folded wallets found after opening zipped clutch purse inside bag—deemed "a veritable Easter egg hunt"—violated article I, section 7 of Hawaiʻi Constitution).

### ii. *transparent containers*

To our knowledge, the question whether a clear or transparent container is a "closed" container for purposes of the rules expressed in *Kaluna, Barnes, Joyner, Ching, Ortiz,* and *Goodwin* is (except to the extent that it was impliedly addressed in *Davenport* ) one of first impression in this jurisdiction. We therefore look to the case law of other jurisdictions to answer it.

In *United States v. Ramos,* 960 F.2d 1065 (D.C.Cir.1992), the defendant (Ramos) moved to suppress evidence of a clear plastic bag containing more than thirty plastic vials of the type commonly used to package drugs for distribution, which he had placed in a recessed space between two seats of a public bus, on the ground, *inter alia,* that its warrantless seizure by the police contravened his reasonable expectation of privacy therein. Affirming the district court's denial of his motion to suppress, the United States Court of Appeals for the District of Columbia Circuit (composed of a panel that included present United States Supreme Court Justice Ruth Bader Ginsburg), ruled in relevant part as follows:

> Ramos understandably skirts ... key facts. ... *[T]he plastic bag was transparent. ... Because Ramos' "luggage" was transparent, he could have no expectation of privacy in the bag itself.* While "a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf [may] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attache case," the fourth amendment provides protection to the owner of only a "container that conceals its contents from plain view." *United States v. Ross,* 456 U.S. [at] 822–23 [102 S.Ct. at 2171–72]

...; *accord Smith v. Ohio*, 494 U.S. 541 [110 S.Ct. 1288, 108 L.Ed.2d 464] ... (1990).

. . . .

[Ramos] could not reasonably expect privacy in a *clear* plastic bag. . . .

*Id.* at 1067–68 (emphases added) (some brackets in original and some added).[17] *See also United States v. Cardona–Rivera*, 904 F.2d 1149, 1156 (7th Cir.1990) ("The clearest case (pun intended) is *where the container is glass,* so that *the contents are visible to the world.* By using a glass container *the owner has* so far *waived his right to privacy* that it would be pedantic to require the police to obtain a warrant if they want to get inside the container, say to *test the contents for their chemical composition,* as here.") (Emphases added.)).

*State v. Schrier,* 283 N.W.2d 338 (Iowa 1979), presented "the question of the propriety of a warrantless search and seizure of a small knapsack containing marijuana and related paraphernalia, lying on the floor of an automobile near the place where the driver's feet would be." *Id.* at 339. Schreier, the defendant and driver of the automobile, appealed his conviction of possession of marijuana with intent to distribute, urging that the trial court had committed reversible error in denying his motion to suppress, *inter alia,* the evidence of the knapsack and its contents. The police obtained the evidence after stopping Schreier for speeding. The officer making the stop detected the odor of alcohol, directed Schreier to exit the vehicle, and arrested him for driving under the influence of intoxicants. An assisting officer shined his flashlight into the vehicle and observed the knapsack, from which a clear plastic bag containing a plant-like material later determined to be marijuana was visibly protruding, within the immediate reach of two of the vehicle's occupants. The officer immediately retrieved the knapsack and, later unlatching it at the police station, searched its contents, discovering additional packages of marijuana and related drug par-

aphernalia. Schreier was subsequently charged with and convicted of the drug offense.

On appeal, the Iowa Supreme Court acknowledged its adherence to the principle that a "search and seizure without a valid warrant is per se unreasonable unless it comes within a recognized exception [to the fourth amendment's proscription against unreasonable searches and seizures] such as consent, search incident to arrest, probable cause and exigent circumstances, or *plain view.*" *Id.* at 342 (citation omitted) (emphasis added). Accordingly, the *Schrier* court held preliminarily that

> the warrant requirement of the Fourth Amendment applies to personal luggage taken from an automobile to the same degree it applies to luggage in other locations. Thus, insofar as the police are entitled to search such luggage without a warrant, their actions must be justified under some exception to the warrant requirement other than that applicable to automobiles stopped on the highway. Where—as in the present case—the police, without endangering themselves or risking loss of the evidence, lawfully have detained one suspected of criminal activity and secured his suitcase, they should delay the search thereof until after judicial approval has been obtained. In this way, constitutional rights of suspects to prior judicial review of searches will be fully protected.

*Id.* at 343.

Thus, the *Schrier* court addressed the question whether the assisting officer "transgress[ed] the proscription on unreasonable searches and seizures when, without unlatching the bag, he then peered into it by pushing the flap aside and, upon seeing the contents, in later opening the bag at the station and emptying its contents?" *Id.* at 346. The court deemed the answer

> to turn on whether, under the circumstances, [Schreier] had a reasonable expec-

**17.** The *Ramos* court further held that, for purposes of the fourth amendment to the United States Constitution, Ramos had no reasonable expectation of privacy in the crevice between the seats of the bus. We express no opinion regarding the applicability of this holding to article I, section 7 of the Hawai'i Constitution. *Ramos* is relevant to the appeal before us only with respect to its discussion of clear containers.

tation of privacy regarding the contents. One of the circumstances was the presence of a [clear] *plastic* bag of marijuana on the *exterior* of the knapsack, protruding two or three inches. This indicates a certain nonchalance about the marijuana. True, the plastic bag on the outside would probably indicate only possession, whereas the articles inside indicated possession with intent to deliver. Nonetheless, *placing the plastic bag on the outside reveals defendant's attitude in the matter of privacy or secrecy with respect to the marijuana....*

*Id.* (emphases added). On the basis of the foregoing reasoning, the *Schrier* court held that

the facts here do not reveal a reasonable expectation of privacy such that, after [the assisting officer] properly seized the bag, he acted *unreasonably* in looking into it at the scene. To hold otherwise would require us to tell the officer that although he knew the bag contained what appeared to be marijuana in its pouch, he could not look into the main compartment of the bag by pushing aside the flap.

*Id.* (emphasis in original).[18]

Finally, in *Commonwealth v. Irwin,* 391 Mass. 765, 463 N.E.2d 1178 (1984), the Massachusetts Supreme Judicial Court affirmed the defendant's conviction, *inter alia,* of unlawful possession of controlled substances arising out of the warrantless seizure and search of a "Tupperware" type container, in the interior of which marijuana was readily discernible as if the container were composed of "clear plate glass." *Id.* at 1179. Reject-

ing the defendant's argument that, even though the police officer had probable cause to believe that contraband was in the container, a warrant was required as a prerequisite to opening it, the court held:

Here the judge permissibly found that it was unnecessary for the officer to open the container in order to see the color and shape of its contents with sufficient clarity to identify them as marijuana. *The contents were in plain view. No privacy interest was affected by opening the container. No search in the constitutional sense was involved, and consequently no warrant for that purpose was required.* The defendant correctly does not contend that a warrant was required for seizure, as distinguished from a search, of the container. As we have said before, contraband may be seized by the police without a warrant whenever it is within plain view and in a place where the police have a right to be.

*Id.* at 1181 (citation and internal quotation marks omitted) (emphasis added).

### iii. *summary*

 We deem the reasoning of *Ramos, Cardona–Rivera, Schrier,* and *Irwin* regarding the significance of clear or transparent containers—within the context of seizures and searches in the constitutional sense—to be compelling and persuasive. We therefore adopt that reasoning in applying both the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution to the present appeal.

---

18. Based on the cases and reasoning of sections III.A.2.b. and III.A.2.c. of this opinion, and, in particular, the portions of Justice Marshall's dissent in *Ross* set forth *supra* at note 16, we would approve the seizure of the clear plastic bag and the search of its contents, both of which arose out of the assisting officer's plain view observation. Moreover, we would approve the warrantless *seizure* of the knapsack based upon the manifest presence of probable cause to believe that it contained evidence of criminal activity and the exigency created by the proximity of the vehicle's occupants. However, because the exigency ceased when the police obtained exclusive possession of the knapsack, and for the reasons stated in Justice Marshall's dissent in *Ross,* we would hold that the warrantless *search* of the interior of the knapsack, had it occurred in Hawai'i, would have violated article I, section 7 of the Hawai'i Constitution. To do otherwise

would be to create "a new 'probable cause' exception to the warrant requirement," *see Ross,* 456 U.S. at 832, 102 S.Ct. at 2177 (Marshall, J., dissenting), which we have steadfastly refused to do in the past. *See, e.g., Bonnell,* 75 Haw. at 137–38, 856 P.2d at 1273 ("'[N]o amount of probable cause can justify a warrantless search or seizure absent exigent circumstances' or some other recognized exception to the warrant requirement." (quoting *State v. Kapoi,* 64 Haw. 130, 141, 637 P.2d 1105, 1114 (1981) (internal quotation marks omitted)); *Ritte,* 68 Haw. at 257–58, 710 P.2d at 1201 (holding that, even assuming existence of probable cause, warrantless search is unreasonable in absence of some judicially recognized justification).

We emphasize that the significance of *Schrier* for present purposes is its discussion of the relationship between transparent "containers" and reasonable expectations of privacy.

Accordingly, we hold that the forty-three heat-sealed clear plastic packets were not "closed" containers, within the meaning of *Kaluna, Barnes, Joyner, Ching, Ortiz,* and *Goodwin,* because their contents, by their very nature, were within the "plain view" of Officer Matsuura, who had inadvertently discovered them following his justified intrusion into the multicolored cloth bag. *See supra* sections III.A.2.a. and III.A.2.b. In other words, the forty-three heat-sealed clear plastic packets, which were *incapable* of concealing their contents from plain view, were virtual "windows" on their contents and, thus, effectively not "containers" at all. As we have noted, Wallace concedes that, by virtue of the lawfully issued warrant, Officer Matsuura possessed "authority to search, in a reasonable manner, whatever spots within the described premises [his] experience indicate[d] [might] be used as a cache," *see Davenport,* 55 Haw. at 100, 516 P.2d at 72, and that the multicolored cloth bag was just such a "plausible repositor[y] for marijuana." *See id.* Being simply an extension of the prior justification for his access to the packets, Officer Matsuura's plain view observations of the contents of the packets could not constitute any further invasion of Wallace's reasonable expectation of privacy, the contents being the functional equivalent of "loose" cocaine. Absent a governmental invasion of any reasonable expectation of privacy on Wallace's part, there could be no "further search" in the constitutional sense. And if there was no "further search" in the constitutional sense, then Officer Matsuura could have been under no obligation to obtain a warrant in order to open the legitimately seized clear plastic packets. *See supra* section III.A.2.b.

d. *Plain view and the expectation of privacy in the identity of a substance*

The foregoing holding effectively disposes of Wallace's contention that "[t]he trial court erred in concluding that '[Wallace] had absolutely no reasonable expectation of privacy in forty-three (43) packets of cocaine' and '[that the police] had a right to find out what the suspected substance was' [without the authority of a warrant]." Armed with a lawfully issued warrant to search Wallace's vehicle for marijuana and related paraphernalia, Officer Matsuura was empowered to seize and search the interior of the multicolored cloth bag, which was a plausible repository of—or cache for—marijuana (FOF No. 8 and COL Nos. 1 and 3). The inadvertent plain view discovery of the forty-three heat-sealed packets contained therein supplied Officer Matsuura, who had observed cocaine on "hundreds" of prior occasions and was qualified to test substances for the presence of cocaine, with ample probable cause to believe that the clearly visible contents of the packets were indeed cocaine (FOF Nos. 8, 9, 13, and 14 and COL No. 4).

 Being in plain view, Wallace could claim no reasonable expectation of privacy in the suspected cocaine. *Meyer,* 78 Hawai'i at 312, 893 P.2d at 163. "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." *United States v. Jacobsen,* 466 U.S. 109, 122, 104 S.Ct. 1652, 1661, 80 L.Ed.2d 85 (1984) (footnote omitted). That being the case, "[a] chemical test that merely disclose[ed] whether or not a particular substance is cocaine [did] not compromise any legitimate interest in privacy" that Wallace may have retained. *Id.* at 123, 104 S.Ct. at 1661.[19] By employing clear plastic packets to separate the cocaine into discrete units, Wallace "so far waived his right of privacy that it would be pedantic to require the police to obtain a warrant ... to test the contents for their chemical composition[.]" *Cardona–Rivera,* 904 F.2d at 1156.

---

**19.** We have no quarrel with the observation of Justice Brennan, joined by Justice Marshall in dissenting from the majority opinion in *Jacobsen,* that "the question whether the employment of a particular surveillance technique constitutes a search depends on whether the technique intrudes upon a reasonable expectation of privacy." *Jacobsen,* 466 U.S. at 141–42, 104 S.Ct. at 1671 (Brennan, J., dissenting). Indeed, our decision in *Bonnell, supra,* is an exemplar of that very observation.

Because the "governmental intrusion" occasioned by the chemical testing of the cocaine did not invade any legitimate expectation of privacy on Wallace's part, "there [was] no 'search' subject to the Warrant Clause," *Meyer*, 78 Hawai'i at 312, 893 P.2d at 163, and therefore "no 'search' in the constitutional sense." *Lopez*, 78 Hawai'i at 441, 896 P.2d at 897. Accordingly, under the circumstances of this appeal, we hold that obtaining a warrant from a "neutral magistrate" was not a necessary precondition to subjecting the suspected cocaine to chemical testing.

### 3. *The bottom line*

For the foregoing reasons, we hold that the circuit court's COL No. 5 was supported by its findings of fact and correctly applied the relevant law construing the parameters of the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution. As such, the challenged portion of COL No. 5—*i.e.*, that "[i]n the instant case, [Wallace] had absolutely no reasonable expectation of privacy in [the] forty-three (43) packets of cocaine" and that "[t]he police had a right to ... find out what the suspected substance was"—is not "wrong." It therefore follows, and we so hold, that the circuit court correctly denied Wallace's motion to suppress.

B. *Although The Evidence Properly Admitted At Trial Was Insufficient As A Matter Of Law To Support Wallace's Conviction Of The Offense Charged In Count One, It Was Sufficient To Support A Conviction Of A Lesser Included Offense; By Contrast, In light Of Wallace's Failure Adequately To Preserve His Objection To The Admissibility Of Testimony Regarding The Gross Weight Of The Seized Marijuana, The Evidence Properly Admitted At Trial Was Sufficient To Support Wallace's Conviction As to Count Three.*

In his second point of error on appeal, Wallace challenges the sufficiency of the evidence adduced at trial to convict him of promoting a dangerous drug in the first degree in violation of HRS § 712–1241(1)(a)(i), as charged in Count One, *see supra* note 1, and promoting a detrimental drug in the second degree in violation of HRS § 712–1248(1)(c), as charged in Count Three, *see supra* note 3. Specifically, Wallace contends that the prosecution "did not present competent evidence that the marijuana weighed 'one ounce or more' and that the white powder also weighed 'one ounce or more' as required by the [applicable] statutes."

■ " 'It is well established, as a precept of constitutional as well as statutory law, that an accused in a criminal case can only be convicted upon proof by the prosecution of *every [material] element of the crime charged* beyond a reasonable doubt.' " *State v. Puaoi*, 78 Hawai'i 185, 191, 891 P.2d 272, 278 (1995) (quoting *State v. Lima*, 64 Haw. 470, 474, 643 P.2d 536, 539 (1982)) (emphasis added). Possession of "one ounce or more" of substances containing cocaine and marijuana are material elements of the offenses charged respectively in Counts One and Three. *See supra* notes 1 and 3 and *infra* sections III.B.2.c and III.B.4. Therefore, if Wallace's contention is correct, then there was insufficient evidence to convict him of either charged offense. *Malufau I*, 80 Hawai'i at 132, 906 P.2d at 618; *Okumura*, 78 Hawai'i at 403, 894 P.2d at 100; *Pone*, 78 Hawai'i at 265, 892 P.2d at 458.[20]

■ In this connection, we note that the evidence adduced at trial regarding the weight of the cocaine and marijuana derived from expert testimony that relied upon scientific measurements obtained from calibrated weighing instruments for its accuracy. " 'Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion.' " *State v. Maelega*, 80 Hawai'i 172, 180, 907 P.2d 758, 766 (1995) (quoting

---

20. We note that, on appeal, Wallace does not challenge the sufficiency of the evidence proving that the substances at issue in Counts One and Three, respectively, contained cocaine and marijuana. In any event, that the substances in question contained cocaine and marijuana is supported by substantial evidence in the record.

*State v. Montalbo,* 73 Haw. 130, 140–41, 828 P.2d 1274, 1281 (1992)).

■ Nevertheless, to be admissible, "expert testimony must be both relevant and reliable." *Id.,* at 181, 907 P.2d at 767. The reliability of expert testimony supplying scientific evidence depends upon the proper application of valid techniques grounded in valid underlying principles. *Montalbo,* 73 Haw. at 136, 828 P.2d at 1279. It is axiomatic that such reliability is not possible in the absence of "a sound factual foundation." *See id.* at 138, 828 P.2d at 1280 (quoting *State v. Kim,* 64 Haw. 598, 604, 645 P.2d 1330, 1336 (1982), *overruled on other grounds by, State v. Batangan,* 71 Haw. 552, 799 P.2d 48 (1990)).

■ Thus, "[a] fundamental evidentiary rule is that before the result of a test made out of court may be introduced into evidence, a foundation must be laid showing that the test result can be relied on as a substantive fact." *State v. Kemper,* 80 Hawai'i 102, 105, 905 P.2d 77, 80 (App.1995) (citation and internal quotation marks omitted). Part of the foundational prerequisite for the reliability of a test result is a showing that the measuring instrument is "in proper working order." *See State v. Thompson,* 72 Haw. 262, 263, 814 P.2d 393, 395 (1991) (citation and internal quotation marks omitted); *Kemper,* 80 Hawai'i at 105, 905 P.2d at 80.

### 1. *Evidence of the weight of the cocaine (Count One)*

Testimony bearing upon whether the cocaine at issue in Count One weighed "one ounce or more" for purposes of HRS § 712–1241(1)(a)(i) was supplied by Officer Matsuura and Donald Chinng. The trial transcript reveals the following in connection with the direct examination of Officer Matsuura by the deputy prosecuting attorney (DPA) regarding the *gross* weight of the cocaine, inclusive of the forty-three heat-sealed clear plastic packets:

[DPA:] And once you finished [the] field test [of] the cocaine, what did you do with it?

A. I got a weight, a gross weight of the cocaine, all in the packets. Gross weight is taking the weight of the plastic packet[s] as well as what's inside.

Q. What did you . . . use to get the approximate gross weight?

A. It was a State of Hawai'i certified gram scale.

Q. What weight did you come out with?

A. I believe it was—

[Defense counsel]: Objection, Your Honor. The weight that we're talking about right now is gross weight and I don't think that's relevant at this point. We're talking about net weight of cocaine. If Mr. Chinn is going to testify as to that weight, then Mr. Chinn should testify as to that.

. . . .

THE COURT: . . . I'll permit it.
BY [the DPA]:

Q. Officer Matsuura, what was the approximate gross weight of all these packets?

A. I believe it was 56.2 grams.

Q. Do you know the conversion [from] ounces to grams?

. . . .

A. 28.35 grams in an ounce.

Q. So would that approximate gross weight be over one ounce?

A. Yes, Ma'am.

Wallace's cross-examination of Officer Matsuura regarding the gross weight of the cocaine was limited to the following brief exchange:

[Defense counsel:] Now—when you testified about the gross weight of the cocaine, you were talking about the weight including packets; right?

A. That is correct sir.

Q. And the bags? [21]

A. That is correct.

---

**21.** It is unclear from the record what defense counsel meant by "the bags." It would appear that "the packets" and "the bags" were identical references to the forty-three heat-sealed clear plastic packets, inasmuch as Officer Matsuura did not testify that he ever weighed the multicolored cloth bag in which the packets were originally discovered.

Chinn's trial testimony on direct examination by the DPA, with respect to the *net* weight of the cocaine, exclusive of the forty-three heat-sealed clear plastic packets, consisted of the following:

[DPA:] Could you please explain what tests you did on the 43 individual packets of alleged cocaine?

A. Each of the 43 heat-sealed plastic packets were cut open. Before that I weighed the item to determine the net weight of the total exhibit. . . .

. . . .

Q. Mr. Chinn, you . . . stated that you took a net weight from each of the 43 packets before you did the testing and do you recall what that net weight was?

[Defense counsel]: Objection, [Y]our Honor, hearsay.

THE COURT: Overruled.

[Defense counsel]: Your Honor, it's hearsay as to the fact that he's using a scale. *We don't know if the scale is accurate* or we are assuming at this point that he's using a scale.

THE COURT: That's not hearsay, but all right. *Lay a foundation.*

BY [the DPA]:

Q. Mr. Chinn, what particular instrument did you use to perform your analysis on them?

A. We have in the laboratory what we call a top load electronic balance and we have that particular balance calibrated every year by an outside agency.

Q. Is that the same scale that you used to weigh this particular evidence . . . ?

A. That's correct.

Q. What was your net weight that you took from the 43 packets?

A. The total net weight for the 43 packets was—

[Defense counsel]: Still objection, Your Honor?

THE COURT: On what basis?

[Defense counsel]: It's still hearsay.

THE COURT: Overruled.

THE WITNESS: Total net weight was 40.94 grams.

(Emphases added.)

During Wallace's cross-examination concerning the accuracy of the scale used to weigh the cocaine, the following exchange occurred:

[Defense counsel:] Mr. Chinn, you indicated that this scale is calibrated every year by an outside agency?

A. That's correct.

Q. That outside agency is, do you know?

A. It's a . . . commercial company that does this type of work for laboratories here in Hawai'i. The company is Baxter's Scientific Product and they have a person that is qualified to service and to calibrate balances in Hawai'i.

Q. Supposedly qualified; right? You don't know in fact if he's qualified? You assume that he's qualified when he's coming into your office and calibrating the machine?

A. That's correct. He is the service representative for the manufacturer of that particular instrument. So *I assume he's qualified to service and calibrate the balance.*

. . . .

Q. That's what . . . calibration [means], to make sure [the balance] is working properly?

A. That's correct.

(Emphasis added.)

At the close of the evidence, Wallace orally moved for a judgment of acquittal [22] as to Count One only, arguing as follows:

Your Honor, we would make a motion for judgment of acquittal on count one, that's the promoting dangerous drug in the first degree. . . . The State did not pro[ve] beyond a reasonable doubt that the sub-

---

22. Hawai'i Rules of Penal Procedure Rule 29(a) (1981) provides in relevant part:

The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses alleged in the charge after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

stances had an aggregate weight of one ounce or more containing cocaine. . . .

Your Honor, the testimony of Mr. Chinn was that he . . . didn't know the . . . representative that was calibrating the scale. He just assumed that he was qualified to perform this. It's all hearsay and even though the Court had admitted that testimony, I'm asking now that the Court . . . strike[ ] that testimony and the State hasn't proved their case beyond a reasonable doubt.

Your Honor, this essential element is that it has to be one ounce or more. That's why it's a class A felony. . . . At least, Your Honor, the State should come in and prove that, and bring in a person . . . who is qualified to testify. . . .

The circuit court denied Wallace's motion, deeming the prosecution to have laid sufficient foundation as to the accuracy of the electronic balance by virtue of "Mr. Chinn[,] who's a qualified forensic chemist, the guy running the Naval Investigative Lab," having testified that he weighed the cocaine and that "the scale is calibrated annually." Based on the evidence adduced, the circuit court then found that the prosecution had proved beyond a reasonable doubt that Wallace had possessed cocaine "in an amount exceeding one ounce" and that Wallace was therefore guilty as charged of promotion of a dangerous drug in the first degree.

2. *Sufficiency of the evidence of the weight of the cocaine (Count One)*

a. *Evidence of gross weight*

Wallace urges that Officer Matsuura's testimony regarding the gross weight of the cocaine was erroneously admitted for two reasons. First, he contends that it was irrelevant because "the *gross weight* of the plastic packets and the contents does not prove beyond a reasonable doubt the *aggregate or net*

weight" of the cocaine. (Emphases in original.) Second, he notes that "the State did not establish the accuracy of the [certified gram] scale" that Officer Matsuura used.

■ This court reviews questions of relevancy, within the meaning of Hawai'i Rules of Evidence (HRE) Rules 401 (1993)[23] and 402 (1993)[24] under the "right/wrong" standard, inasmuch as the application of those rules "can yield only one correct result." *Kealoha v. County of Hawaii*, 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied*, 74 Haw. 650, 847 P.2d 263 (1993). The commentary on HRE 401 elucidates the critical distinction between the relevance and sufficiency of evidence:

This rule restates existing [Hawai'i] law. In *State v. Smith*, 59 H[aw.] 565, 567, 583 P.2d 347, 349 (1978), the court defined the concept of relevance: "Evidence is relevant if it tends to prove a fact in controversy or renders a matter in issue more or less probable." The court in *Smith* also relied upon the holding in *State v. Irebaria*, 55 H[aw.] 353, 356, 519 P.2d 1246, 1248–49 (1974), for the distinction between relevance and sufficiency of the evidence:

The concept of relevance, however, does not encompass standards of sufficiency. [The] contention that evidence which, standing alone, is insufficient to establish a controverted fact, should be inadmissible is totally without basis in the law. It is often said that a brick is not a wall. [The foregoing contention] through a "sufficiency" standard would take away the building blocks of a prima facie case. The sufficiency standard should apply only when all the bricks of individually insufficient evidence are in place and the wall is itself tested.

This rule preserves the Irebaria distinction between relevance and sufficiency by

---

**23.** HRE 401 provides:
**Definition of "relevant evidence".** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**24.** HRE 402 provides:

**Relevant evidence generally admissible; irrelevant evidence inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawai'i, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

establishing, as the requisite standard of probability, that the consequential fact be rendered "more probable or less probable than it would be without the evidence." As the Advisory Committee's Note to Fed. R.Evid. 401 put it: "Any more stringent requirement is unworkable and unrealistic. Dealing with probability in the language of the rule has the added virtue of avoiding confusion between questions of admissibility and questions of the sufficiency of the evidence."

(Some brackets added and some deleted.) (Ellipsis points omitted.) (Some internal quotation marks deleted.)

 With respect to his first contention, it is particularly significant that Wallace's relevancy objection to Officer Matsuura's testimony that the gross weight of the cocaine was 56.2 grams—the equivalent of 1.982 ounces, *see supra* note 5—was based on the greater probative value of Chinn's anticipated testimony regarding the net weight of the cocaine. *See supra* section III.B.1. In other words, Wallace's objection was implicitly grounded in the proposition that evidence of the gross weight of the cocaine, inclusive of the forty-three clear plastic packets, would be *insufficient*, without more, to establish one of the material elements of promoting a dangerous drug in the first degree beyond a reasonable doubt, namely, that the net weight of the cocaine was "one ounce or more." While this proposition, as discussed *infra* in this opinion, is correct, it does not establish that the evidence of the gross weight of the cocaine lacked any "tendency to make the existence of any fact that is of consequence to the determination of the action more probable ... than it would be without the evidence." HRE 401. Put differently, the evidence of the gross weight of the cocaine rendered the "consequential fact" that its net weight was at least one ounce "more probable ... than it would be without the evidence." Commentary on HRE 401. Thus, Wallace is confusing the distinction between relevance and sufficiency, and the evidence was clearly relevant within the meaning of HRE 401 and 402. We therefore hold that the circuit court was not "wrong" in admitting it.

 With respect to Wallace's second contention, his objection at trial to Officer Matsuura's testimony regarding the gross weight of the cocaine did not challenge the accuracy of the certified gram scale. Although that testimony, lacking sufficient foundation, would have been inadmissible in the face of an adequately preserved objection, *see infra* sections III.B.2.b. and III.B.4., " '[t]he rule is well settled that evidence even though incompetent, if admitted without objection or motion to strike, is to be given the same probative force as that to which it would be entitled if it were competent.' " 2 *Wharton's Criminal Evidence* § 265 n. 3 (14th ed. 1986) [hereinafter referred to as *"Wharton"*] (quoting *State v. White,* 215 S.C. 450, 55 S.E.2d 785 (1949)). We therefore hold, under the circumstances of this appeal, that the issue of the accuracy of the scale has been waived.

> [The] testimony [at issue] was inadmissible. Nonetheless no objection was made to [its] admission and the issue is now being raised for the first time on appeal.
>
> It is the general rule that evidence to which no objection has been made may properly be considered by the trier of fact and its admission will not constitute ground for reversal. It is equally established that an issue raised for the first time on appeal will not be considered by the reviewing court. Only where the ends of justice require it, and fundamental rights would otherwise be denied, will there be a departure from these principles. [Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1994)]. We find no such justification here.

*State v. Naeole,* 62 Haw. 563, 570–71, 617 P.2d 820, 826 (1980) (some citations omitted); *see also State v. Samuel,* 74 Haw. 141, 147, 838 P.2d 1374, 1378 (1992); HRE 103(a)(1) (1993).[25]

---

**25.** HRE 103 provides in relevant part:

**Rulings on evidence.** (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence un- less a substantial right of the party is affected, and:

(1) Objection. In case the ruling is one admitting evidence, a timely objection or mo-

### b. *Evidence of net weight*

Wallace challenges the circuit court's admission of Chinn's testimony regarding the net weight of the cocaine, as measured by the electronic balance, over his objection at trial that an inadequate foundation had been laid as to the accuracy of the instrument. *See supra* section III.B.1.[26] In support of his position, Wallace relies exclusively on *State v. Bannister*, 60 Haw. 658, 594 P.2d 133 (1979).

In *Bannister*, this court reversed the defendant's conviction of theft in the first degree, holding that the prosecution had failed to prove that the defendant had stolen shorts exceeding $200.00 in value from a store, thus failing to prove every material element of the charged offense beyond a reasonable doubt. At trial, the evidence of the value of the stolen shorts consisted solely of the store manager's testimony that fifty-three pairs of shorts were missing and that the retail value of the shorts was $6.50 per pair. The store manager derived the number of missing garments by subtracting the number that she counted after the theft from the number apparently counted by the "receiving man," who, one day prior to the theft, had recorded the number on an invoice. The invoice, which had not been brought to court, was not offered into evidence. Defense counsel objected to the store manager's testimony on the basis that it lacked a proper foundation.

Agreeing with the defendant, the *Bannister* court held, *inter alia*, that:

> Testimony based on information supplied by another person that is not in evidence is inadmissible. The rationale is that the witness' knowledge is based on hearsay evidence and the trier of fact is unable to test the source's trustworthiness. This proposition is subject to the regular hearsay exceptions.
>
> The manager's testimony was based solely upon the receiving man's recording on the invoice. The invoice was not in evidence. None of the hearsay exceptions applied [to the store manager's testimony.] Thus, the testimony was inadmissible.
>
> Since the manager's testimony was the only evidence of the number of shorts stolen that would support the conviction and a necessary element of the crime was the value of the stolen goods, the State failed to prove every element of the crime beyond a reasonable doubt.

*Id.* at 659–60, 594 P.2d at 134–35 (citations omitted) (emphases added). Based on the foregoing analysis, the *Bannister* court reversed the defendant's conviction and remanded the matter to the circuit court for the entry of a judgment of acquittal. *Id.* at 661, 594 P.2d at 135.[27]

By analogy, Wallace argues that the prosecution failed to prove beyond a reasonable doubt that the cocaine seized from his vehicle weighed one ounce or more because Chinn's testimony concerning the accuracy of the electronic balance used to weigh the cocaine

---

> tion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]
>
> Professor Bowman has observed that
>
> > rule 103(a) should be read as if it were written as follows: "Error may not be predicated [on appeal] upon a [trial] ruling which admits or excludes evidence unless...."
> >
> > The thrust of this rule is to establish record requirements and to furnish harmless error and plain error standards.
> >
> > Rule 103(a) places the burden of creating an adequate record squarely upon the parties and, more particularly, upon the party who loses the evidence point at trial. This follows from rule 103(a)(1) which requires timely and specific objections where evidence is admitted.... [W]here the opponent has failed to object specifically, ... whichever party loses the point at trial should also lose on appeal because the flaw in the trial court's ruling was not articulated

> by the party with the natural incentive and opportunity to do so.
>
> A. Bowman, *Hawaii Rules of Evidence Manual* 7–8 (1990).

26. We note that Wallace's objection was actually interposed on "hearsay" grounds. Nevertheless, given the "context" of Wallace's explanation of the basis of his objection, it was "apparent" to the circuit court that the objection was really one of lack of proper foundation. *See* HRE 103(a)(1), *supra* at section III.B.2.a. and accompanying text at note 25.

27. Apparently because the question of the possibility of retrial on lesser included offenses following reversal of the defendant's conviction because of insufficient evidence regarding the charged offense, discussed *infra* at section III. B.2.d., was not raised on appeal, the *Bannister* court did not address it.

was inadmissible. Specifically, Wallace urges that Chinn's testimony regarding the net weight of the cocaine was inadmissible because (1) Chinn had no personal knowledge that the electronic balance had been properly calibrated, and (2) any testimony pertaining to such calibration was based on hearsay obtained from the person who calibrated the instrument.[28] We agree.

■ As the trial court noted, Chinn apparently had personal knowledge that the electronic balance was calibrated annually; his testimony to that effect was therefore admissible. HRE 602 (1993). However, by his own admission, Chinn lacked personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so. The service representative did not testify at trial regarding his calibration of the balance, nor did the prosecution, through a custodian of records, offer any business record of the manufacturer reflecting proper calibration of the balance. *See supra* note 28. There being no reliable evidence showing that the balance was "in proper working order," *see Thompson,* 72 Haw. at 263, 814 P.2d at 395; *Kemper,* 80 Hawai'i at 105, 905 P.2d at 80, the prosecution failed to lay "a sound factual foundation" that the net weight of the cocaine measured by the balance was accurate. *See Montalbo,* 73 Haw. at 138, 828 P.2d at 1280. Therefore, because inadequate foundation was laid to show that the weight measured by the balance could "be relied on as a substantive fact," *see Kemper,* 80 Hawai'i at 105, 905 P.2d at 80, Chinn's assumption that the balance was accurate was based on inadmissible hearsay. *Bannister,* 60 Haw. at 659–60, 594 P.2d at 134–35. Accordingly, we hold that the circuit court clearly abused its discretion in admitting Chinn's testimony regarding the net weight of the cocaine. *See Maelega,* 80 Hawai'i at 180, 907 P.2d at 766.

**c. *Sufficiency of the evidence in the absence of testimony regarding the net weight of the cocaine***

Disregarding the erroneously admitted evidence of the net weight of the cocaine, and considering the remaining evidence in the strongest light for the prosecution, *Malufau I,* 80 Hawai'i at 132, 906 P.2d at 618, we must now ascertain whether the purged trial record was legally sufficient to support Wallace's conviction of promoting a dangerous drug in the first degree as charged in Count One.

HRS § 701–114(1)(a) and (b) (1993) requires proof beyond a reasonable doubt of each element of the offense, as well as the state of mind required to establish each element of the offense. Moreover, HRS § 702–204 (1993) provides in relevant part that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies with respect to each element of the offense." ... HRS § 702–207 (1993) provides that "[when] the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears." In addition, pursuant to HRS § 702–205 (1993), the requisite state of mind applies to such conduct, attendant circumstances, and results of conduct as are specified by the definition of the offense.

*State v. Holbron,* 80 Hawai'i 27, 39, 904 P.2d 912, 924 (1995) (citations and some internal quotation marks omitted) (emphasis and some brackets deleted); *see also State v. Kinnane,* 79 Hawai'i 46, 52–53, 897 P.2d 973, 979–80 (1995); *Pone,* 78 Hawai'i at 265, 892 P.2d at 458.

28. Wallace concedes in his brief that "[a] document provided by the calibrating agency showing the name of the person calibrating the [balance], that he was qualified, [and] that [the balance] was calibrated on a certain date may well have fallen under the hearsay exception[s] [relating to] business records, but this was not [offered into evidence]. *See* [HRE] 803(b)(6) or

803(b)(8)." *Cf. State v. Ofa,* 9 Haw.App. 130, 135–37, 828 P.2d 813, 816–17 (1992) (holding that custodian of records was properly allowed to rely on page of a log documenting maintenance of an intoxilyzer machine, being a "public record and report" for purposes of HRE 803(b)(8)(B), in testifying regarding accuracy of intoxilyzer test results).

A person commits the offense of promoting a dangerous drug in the first degree in violation of HRS § 712–1241(1)(a)(i), *inter alia*, if the person knowingly possesses one or more preparations, compounds, mixtures, or substances [hereinafter collectively referred to as "substances"], of an aggregate weight of one ounce or more, containing cocaine. *See supra* note 1. Accordingly, there were three material elements of the offense of promoting a dangerous drug in the first degree, as charged in Count One against Wallace, each of which the prosecution was required to prove beyond a reasonable doubt in order to establish guilt. These three elements were: (1) that Wallace possessed one or more substances containing cocaine (*i.e.*, the prohibited conduct); (2) that the substances were of an aggregate weight of one ounce or more (*i.e.*, the attendant circumstance of requisite quantity); and (3) that Wallace acted knowingly (*i.e.*, the requisite state of mind with respect to both of the foregoing elements).

 The purged trial record is supported by substantial evidence, *see Malufau I*, 80 Hawai'i at 132, 906 P.2d at 618; *Reed*, 77 Hawai'i at 81–82, 881 P.2d at 1227–28; *In re John Doe, Born on January 5, 1976*, 76 Hawai'i at 92–93, 869 P.2d at 1311–12; *Batson*, 73 Haw. at 248–49, 831 P.2d at 931, that Wallace knowingly possessed cocaine, the gross weight of which—inclusive of the forty-three heat-sealed clear plastic packets—was 1.982 ounces. The record, however, is completely devoid of *any* evidence of the weight of the packets. That being the case, the state of the purged record is that Wallace knowingly possessed cocaine, the aggregate weight of which was less than 1.982 ounces by some unknown amount. Disregarding Chinn's testimony regarding the test results yielded by the electronic balance, the net (*i.e.*, "aggregate") weight of the cocaine, and, by necessary implication, the weight of the packets, is therefore a matter of pure speculation.

As noted above, a material element of the offense of promoting a dangerous drug in the first degree, as charged against Wallace in Count One, is that the cocaine that Wallace possessed was of an aggregate weight of one ounce or more. Because that material element of the offense is not supported by substantial *and admissible* evidence, we hold that the prosecution failed to adduce sufficient evidence to prove every element of the offense beyond a reasonable doubt and that Wallace's conviction must be vacated. *See Bannister*, 60 Haw. at 660–61, 594 P.2d at 135.

d. *Disposition of Count One on remand*

 In *Burks v. United States*, 437 U.S. 1 [98 S.Ct. 2141, 57 L.Ed.2d 1] (1978), the [United States] Supreme Court held that "the Double Jeopardy Clause [29] precludes a second trial once the reviewing court has found the evidence legally insufficient ..." [hereinafter, "the *Burks* rule"]. *Id.* at 18, [98 S.Ct. at 2150–51]. The Court distinguished between reversal for "trial error" and reversal for "evidentiary insufficiency" and explained that:

> [R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e.g.*, incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in ob-

---

29. The double jeopardy clause of the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, *see Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), provides that no person shall "be subject for the same offense to be twice put in jeopardy." Analogously, article I, section 10 of the Hawai'i Constitution provides that "[no] person shall ... be subject for the same offense to be twice put in jeopardy[.]" We have not always construed the two clauses as conterminous. *See, e.g., State v. Lessary*, 75 Haw. 446, 457–59, 865 P.2d 150, 155–56 (1994) (ruling that interpretation given to double jeopardy clause of fifth amendment by United States Supreme Court does not adequately protect individuals from being "subject for the same offense to be twice put in jeopardy," thus requiring additional protection under Hawai'i Constitution).

taining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.

*Id.* at 15, [98 S.Ct. at 2149].

State v. Hamala, 73 Haw. 289, 293, 834 P.2d 275, 277 (1992) (some brackets added and some in original).[30]

Thus, having vacated Wallace's conviction of promoting a dangerous drug in the first degree, as charged in Count One, for evidentiary insufficiency, the double jeopardy clause of the fifth amendment to the United States Constitution bars a retrial of that offense. *Malufau I*, 80 Hawai'i at 132–33, 906 P.2d at 618–19. However, remanding

the case for retrial on *lesser included offenses* offends neither the fifth amendment to the United States Constitution nor article I, section 10 of the Hawai'i Constitution. State v. Malufau, 80 Hawai'i 126 at 136, 906 P.2d 612 at 622 (1995) [hereinafter referred to as *Malufau II* ] (citations omitted). In addition,

> it is well established that if an appellate court deems the evidence insufficient as a matter of law to support a jury's guilty verdict on a greater offense but finds the evidence sufficient to support a conviction on a lesser included offense, it may enter a judgment of conviction on that lesser included offense.

We believe that our present holding is implicit in *Bannister*, in which this court held that, because the evidence adduced at trial—*disregarding* the testimony lacking adequate foundation—was insufficient to prove a material element of the charged offense beyond a reasonable doubt, the *Burks* rule "prevents a new trial" of the charged offense, inasmuch as "[t]he prohibition against double jeopardy where reversal is based on insufficiency of evidence is absolute." 60 Haw. at 660–61, 594 P.2d at 134–35. That the *Bannister* court did not misread *Burks* is confirmed by the *Lockhart* majority, which construed the holding in *Burks*, from which it claimed not to retreat, to be that "when a defendant's conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge." 488 U.S. at 39, 109 S.Ct. at 289 (citing *Burks*, 437 U.S. at 18, 98 S.Ct. at 2150–51; *Greene v. Massey*, 437 U.S. 19, 24, 98 S.Ct. 2151, 2154, 57 L.Ed.2d 15 (1978); and *Hudson v. Louisiana*, 450 U.S. 40, 42–43, 101 S.Ct. 970, 971–72, 67 L.Ed.2d 30 (1981)).

We emphasize that our holding today is in no way intended to erode the principle that the right against double jeopardy does not bar retrial following the reversal of a conviction for "trial error" consisting, without more, of "a judicial process which is defective in [the] fundamental respect [of] incorrect receipt or rejection of evidence[.]" *Hamala*, 73 Haw. at 293, 834 P.2d at 277 (quoting *Burks*, 437 U.S. at 15, 98 S.Ct. at 2149). State v. Pinero, 70 Haw. 509, 778 P.2d 704 (1989), is a perfect illustration of the foregoing principle. Despite the fact that prejudicial "prior bad acts" evidence was erroneously admitted at trial in violation of HRE 404(b), and an expert witness was erroneously permitted to opine that the victim's death resulted from homicide rather than an accident, the defendant's conviction was vacated and the matter *remanded for a new trial* on the charged offense, inasmuch as, disregarding the inadmissible testimony, there was sufficient evidence to support a conviction.

---

30. In *Malufau I*, we noted that an issue "related" to the *Burks* rule is whether, for purposes of applying double jeopardy principles to convictions vacated for legal insufficiency of the evidence adduced at trial, "appellate courts should consider all of the evidence that was admitted at trial or only the evidence that should have been admitted[.]" *Id.*, 80 Hawai'i at 132, 906 P.2d at 618. We recognized that in *Lockhart v. Nelson*, 488 U.S. 33, 34, 109 S.Ct. 285, 287, 102 L.Ed.2d 265 (1988), a majority of the United States Supreme Court held that "in cases ... where the evidence offered by State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause [of the fifth amendment to the United States Constitution] does not preclude retrial." We also recognized that prior case law in this jurisdiction, most notably *Bannister*, implicitly follows "a rule whereby sufficiency of the evidence," for purposes of double jeopardy analysis under article I, section 10 of the Hawai'i Constitution, "is reviewed based only on the evidence that was properly admitted at trial." *Malufau I*, 80 Hawai'i at 132, 906 P.2d at 618. We determined, however, that the facts of the case did not require us to make a definitive choice between the two positions in that appeal, *id.*, at 132, 906 P.2d at 618, a judgment that we reaffirmed on motion for reconsideration in *State v. Malufau*, 80 Hawai'i 126 at 136 n. 2, 906 P.2d 612 at 622 n. 2 (1995) [*Malufau II* ].

Accordingly, "as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution," and "being free to give broader protection under the Hawai'i Constitution than that given by the federal constitution," *see supra* notes 14 and 16, we seize the opportunity in this appeal to make the choice and hold, for purposes of determining whether the double jeopardy clause of article I, section 10 precludes retrial of a defendant whose conviction has been set aside because of insufficient evidence, that sufficiency of the evidence is reviewed *based only on the evidence that was properly admitted at trial.*

*Id.,* 80 Hawaiʻi at 135, 906 P.2d at 621 (citations and brackets omitted). For purposes of article I, section 10, a lesser included offense is an offense that is (1) "included" in a charged offense, within the meaning of HRS § 701–109(4) (1993)[31], and (2) "of a class and grade lower than the greater [charged] offense," as described in HRS §§ 701–109(4)(a)[32] and 701–109(4)(c).[33] *Malufau II,* 80 Hawaiʻi at 138, 906 P.2d at 624; *Malufau I,* 80 Hawaiʻi at 134, 906 P.2d at 620.

▓▓▓▓ Promoting a dangerous drug in the third degree as defined by HRS § 712–

**31.** HRS § 701–109(4) provides in relevant part that "[a] defendant may be convicted of an offense included in an offense charged in the indictment or the information."

**32.** HRS § 701–109(4)(a) provides that an offense is "included" when "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" Under this subsection, "an offense is included if it is impossible to commit the greater without also committing the lesser." *Kinnane,* 79 Hawaiʻi at 51, 897 P.2d at 978 (quoting *State v. Alston,* 75 Haw. 517, 533, 865 P.2d 157, 166 (1994) (citation omitted)).

**33.** HRS § 701–109(4)(c) provides that an offense is "included" when "[i]t differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating a lesser degree of culpability suffices to establish its commission."

Subsection (c) differs from (a) in that there may be some dissimilarity in the facts necessary to prove the lesser offense, but the end result is the same. Under subsection (c) analysis, the following factors are considered: (1) the degree of culpability; (2) the degree or risk of injury; and (3) the end result. *Kinnane,* 79 Hawaiʻi at 51, 897 P.2d at 978 (quoting *Alston,* 75 Haw. at 536, 865 P.2d at 167 (citations and internal quotation marks omitted)).

**34.** HRS § 712–1243 (1993) provides:

> **Promoting a dangerous drug in the third degree.** (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.
> (2) Promoting a dangerous drug in the third degree is a class C felony.

HRS § 712–1240 (1993) defines "dangerous drugs" to mean "any substance or immediate precursor defined or specified as a 'Schedule I substance' or a 'Schedule II substance' by chapter 329, except marijuana or marijuana concentrate." HRS § 329–16(b)(4) (1993) identifies

1243(1) (1993)[34] is a lesser included offense of promoting a dangerous drug in the first degree as charged in Count One.[35] The offense being a class C felony, it is "of a class and grade lower than the greater [charged] offense." By its express terms, and for purposes of HRS § 701–109(4)(a), it is impossible to commit the offense of promoting a dangerous drug in the first degree in violation of HRS § 712–1241(1)(a)(i) without also committing the offense of promoting a dangerous drugs in the third degree. *See supra* note 32. And for purposes of HRS § 701–109(4)(c), promoting a dangerous drug in the

"cocaine or any salt or isomer thereof" as a Schedule II substance.

**35.** Promoting a dangerous drug in the second degree as defined by HRS § 712–1242(1)(b)(i) (1993) is also a lesser included offense of promoting a dangerous drug in the first degree as charged in Count One. HRS § 712–1242 provides in relevant part:

> **Promoting a dangerous drug in the second degree.** (1) A person commits the offense of promoting a dangerous drug in the second degree if he knowingly:
> . . . .
> (b) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
> (i) One-eighth ounce or more, containing . . . methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]
> . . . .
> (2) Promoting a dangerous drug in the second degree is a class B felony.

However, because we review evidentiary sufficiency based only on the evidence that was properly admitted at trial for double jeopardy purposes under article I, section 10 of the Hawaiʻi Constitution, *see supra* note 30, and because, disregarding Chinn's testimony regarding the test results yielded by the electric balance, the "aggregate" weight of the cocaine and the weight of the forty-three heat-sealed clear plastic packets are speculative, *see supra* section III.B.2.c., the prosecution failed to adduce substantial and admissible evidence that the cocaine was "of an aggregate weight of one-eighth ounce or more containing cocaine." As was the case with respect to the *charged* offense in Count One, a particular "aggregate weight" (in this instance, one-eighth ounce or more) is a material element of promoting a dangerous drug in the second degree. Inasmuch as that material element is not supported by substantial and admissible evidence in the record, Wallace's right against double jeopardy precludes a retrial on this lesser included offense. *See generally* section III.B.2.d. of this opinion.

third degree differs from promoting a dangerous drug in the first degree only in the respect that a less serious injury or risk of injury to the same public interest (*i.e.*, "public health and morals," *see generally* HRS ch. 712) suffices to establish its commission. *See supra* note 33.

Moreover, "[t]here was sufficient evidence presented at trial to support ... [this lesser] included offense[ ]." *Malufau I*, 80 Hawai'i at 133, 906 P.2d at 619. As indicated in section III.B.2.c. of this opinion, the purged trial record is supported by substantial evidence that Wallace knowingly possessed cocaine. Ipso facto, there was substantial and admissible evidence in the purged trial record that Wallace knowingly possessed cocaine "in any amount," thereby establishing the offense of promoting a dangerous drug in the third degree. *See supra* note 34.

' For the foregoing reasons, we hold that, upon remand of Count One to the circuit court, a judgment should be entered convicting Wallace of promoting a dangerous drug in the third degree as defined by HRS § 712–1243(1).

### 3. *Evidence of the weight of the marijuana (Count Three)*

The only witness whose testimony bore upon whether the marijuana at issue in Count Three had an "aggregate weight of one ounce or more" for purposes of HRS § 712–1248 was Officer Matsuura, who testified as follows on direct examination by the DPA:

[DPA:] Officer Matsuura, after you did the field tests on the five exhibits [containing marijuana,] did you do anything else?

A. Yes, ma'am. They were weighed.

Q. What did you use to weigh the marijuana?

A. Again, the State of Hawai'i certified gram scale.

Q. Did you get a net weight or gross weight?

A. I believe we got a gross weight.

Q. What was that gross weight?

[Defense counsel]: Objection, hearsay.

THE COURT: I'll permit that.

BY [the DPA]:

Q. What was that gross weight?

. . . .

A. ... It was 55.4 grams gross weight.

Q. That's the gross weight. Officer Matsuura, are you familiar with the conversion from grams to ounces?

A. Yes, ma'am, I am.

Q. Can you tell us what that was?

A. There's 28.35 grams to an ounce.

Q. Officer Matsuura, can you tell us why you took a gross weight and not a net weight of the marijuana?

A. Well, because of the fact [that to commit the offense of] promoting a detrimental drug in the second degree you just have to possess an ounce and the amount that we got of the gross weight, it is over an ounce, and not to disturb the other evidence which is the packets and take all these things out, I just took a gross weight of the thing.

Q. Would the net weight of the marijuana be over an ounce?

[Defense counsel]: Objection, [Y]our Honor, that's speculation.

[DPA]: Your Honor, I believe Officer Matsuura can testify to the fact that in his *opinion* it would be over an ounce and he can explain why it would be over an ounce.

THE COURT: *Lay the foundation.*

BY [the DPA]:

Q. Officer Matsuura, have you often weighed marijuana within the appropriate plastic packets or coverings?

A. Yes, ma'am.

Q. And do you normally take gross weights and normally take net weights?

A. I normally take a gross weight.

. . . .

Q. How are you able to establish whether in fact the net weight of the marijuana that you recovered is over an ounce?

A. By the amount—like in this case, there's 55.4 grams of suspected marijuana vegetation gross weight. If you were to weigh all these little packets, which are about on these—

[Defense counsel]: Objection, [Y]our Honor.

THE COURT: Overruled.

A. A packet of this size would be just shy of a gram and *through my experience,* one ziploc baggie empty ... is about three to four grams and you add that up and you still would have well in excess of an ounce of vegetation.

Q. In this particular case you gave me a gross weight of 55.4 grams?

A. Yes.

Q. Can you tell me whether for sure you know that the net weight of all five exhibits would be over an ounce and why you would know that?

A. From the weight alone, my visual observations, I can tell you right now that right here just these two packs here is well over an ounce.

THE COURT: How is that?

THE WITNESS: Well, through my investigation, sir, ... and the *basic knowledge of how much one of these empty plastic bags weigh.*

THE COURT: How much do they weigh?

THE WITNESS: Somewhere between three to four grams.

THE COURT: How many bags do you have there?

THE WITNESS: Two, sir.

BY [the DPA]:

Q. What was the approximate gross weight of [the two ziploc baggies containing marijuana] which you were referring to?

A. ... [T]he total gross weight of these two bags is ... 52.2 grams, sir.

Q. If you take the two gross weights of 52.2 for those two ziploc bags and you estimated the weight of the two ziploc bags to be how much?

A. If you give the ziploc, give it the extra five grams and you remove ten grams, you still have 40 grams of vegetation left.

Q. Which would be over the one ounce?

A. Yes, ma'am.

. . . .

Q. So *in your opinion* that one exhibit, [the two ziploc baggies containing marijuana], would be over the ounce of net weight of marijuana?

A. That's correct.

Q. *This is based on your training and experience?*

A. *Yes, ma'am.*

(Emphases added.)

During Wallace's cross-examination concerning the weight of the two ziploc baggies, the following exchange occurred:

[Defense counsel:] Now, Officer Matsuura, you testified that the [two ziploc] bags that the marijuana is in ... could not be more that five grams?

A. Could be, sir. They're in the range from three to five grams. I cannot give you an exact.

THE COURT: The question was whether they could be more than five grams.

THE WITNESS: Sure they could.

. . . .

THE COURT: Hundred grams?

THE WITNESS: No, not hundred grams.

[Defense counsel]: Officer Matsuura, in fact, you don't know what they weigh; right?

A. I can't give you an exact unless I put it on the scale, but as I gave you folks from three to five gram range.

Q. ... [W]ell, you never weighed them before and that's why you don't know?

A. On these ones, I can't give you an exact. But *from my experience* to that size, it goes from three to a high of five.

(Emphasis added.)

The totality of Wallace's closing argument regarding the sufficiency of the evidence to convict him of promoting a detrimental drug in the second degree, as charged in Count Three, consisted of the following:

... [O]n count three, weight of one ounce or more.

I believe the officer had testified that he didn't know the weight of the plastic packets. He weighed the marijuana. It was a

gross weight. There's no evidence of how much the packets, the packets themselves, had weighed and so there's not sufficient evidence for conviction on count three.

On the basis of the evidence, the circuit court found that the prosecution had proved beyond a reasonable doubt that Wallace had committed the charged offense.

### 4. Sufficiency of the evidence of the weight of the marijuana (Count Three)

Wallace contends that "[t]here was insufficient evidence to prove that [he] was guilty beyond a reasonable doubt [of] the charge[ ] of Promoting a Detrimental Drug in the Second Degree" because the prosecution "did not present competent evidence that the marijuana weighed 'one ounce or more[.]' " Specifically, Wallace urges that, "[a]s to the testimony of Officer Matsuura [regarding] the weight of the marijuana, the State did not lay sufficient foundation for the accuracy of the [certified gram] scale."

 We note at the outset that, in marked contrast to his objection to Chinn's initial testimony regarding the net weight of the cocaine based upon an inadequate foundation as to the accuracy of the electronic balance, see supra section III.B.1., Wallace expressly challenged neither the accuracy of the certified gram scale that Officer Matsuura used to obtain the gross weight of the marijuana nor the accuracy of the gross weight as measured by the scale.[36] Had Wallace interposed a foundational objection to Officer Matsuura's testimony in this regard, and had the circuit court nevertheless permitted the testimony in a foundational vacuum, then the analysis set forth supra in section III.B.2.b. would apply, and the circuit court would have clearly abused its discretion in admitting Officer Matsuura's testimony

regarding the gross weight of the marijuana. However, Wallace did not interpose such a foundational objection, or, if he did, it "was not apparent from [its] context[.]" See HRE 103(a)(1) and A. Bowman, Hawaii Rules of Evidence Manual 7–8 (1990) [hereinafter referred to as "Bowman"], supra note 25. Thus, for the reasons stated supra in section III.B.2.a., we hold that the issue of the accuracy of the certified gram scale has been waived. See Samuel, 74 Haw. at 147, 838 P.2d at 1378; Naeole, 62 Haw. at 570–71, 617 P.2d at 826; HRE 103(a)(1); Bowman at 7–8; Wharton at § 265 n. 3.

 The question remains, however, as to whether the prosecution presented "competent evidence that the marijuana weighed 'one ounce or more.' " In this connection, we have observed that " '[i]t is for the trial judge as factfinder to assess credibility of witnesses ... and to resolve all questions of fact; the factfinder may accept or reject any witness' testimony in whole or in part.' " State v. Aplaca, 74 Haw. 54, 66, 837 P.2d 1298, 1305 (1992) (quoting Lono v. State, 63 Haw. 470, 473, 629 P.2d 630, 633 (1981)). That being the case, "as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence." Batson, 73 Haw. at 249, 831 P.2d at 931 (citation omitted).

 The circuit court, as trier of fact, had before it probative evidence that the gross weight of the marijuana contained within the two ziploc baggies alone was 52.2 grams—the equivalent of 1.841 ounces. Moreover, Officer Matsuura testified, based on his knowledge, training, and experience, that the two ziploc baggies weighed, at most, ten grams—or .353 ounce—between them. HRE 702.[37] It was a matter of simple arith-

---

36. Indeed, the inference is compelling that Wallace's foundational challenge of Officer Matsuura's measurement of the gross weight of the marijuana is a post-trial afterthought. Were this not so, then defense counsel presumably would have addressed the foundational defect in his closing argument, just as he did with respect to Chinn's lack of personal knowledge regarding the accuracy of the electronic balance used to measure the cocaine. See supra section III.B.1. Instead, as the trial transcript quoted supra in section III.B.3. reveals, defense counsel merely

argued that Officer Matsuura's testimony as to the gross weight of the marijuana was insufficient to establish, beyond a reasonable doubt, an "aggregate" or net weight of one ounce or more, as required by HRS § 712–1248(1)(c).

37. HRE 702 (1991) provided that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the

metic to derive a *net* or "aggregate" weight of 1.488 ounces.

Considering the evidence adduced in the strongest light for the prosecution, and according to the trier of fact the prerogative of resolving all questions of fact, including reasonable and rational inferences under the facts in evidence, we hold that Wallace's conviction of promoting a detrimental drug in the second degree, as charged in Count Three, was supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, we affirm Wallace's convictions in connection with Counts Two and Three. However, we vacate Wallace's conviction as to Count One and remand the matter to the circuit court for the entry of a judgment of conviction of the lesser included offense of promoting a dangerous drug in the third degree as defined by HRS § 712–1243(1).

form of an opinion or otherwise." Effective June 12, 1992, the rule was amended to add the following sentence: "In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert." The 1992 supplemental commentary on HRE noted that "*Montalbo* ... anticipated the ... Rule 702 amendment, thereby confirming the drafters' belief that the amendment made explicit what was formerly implicit in the assistance criterion."

Quoting *Larsen v. State Sav. & Loan Ass'n*, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982), we noted in *State v. Toyomura*, 80 Hawai'i 8, 26 n. 19, 904 P.2d 893, 911 n. 19 (1995), that

[i]t is not necessary that the expert witness have the highest possible qualifications to testify about a particular matter, ... but the expert witness must have such skill, *knowledge,* or *experience* in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth.... Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.

(Emphases added.)